45 Cal.App.4th 1483 (1996)
In re ALEXANDRIA Y., a Person Coming Under the Juvenile Court Law.
ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and Respondent,
v.
RENEA Y., Defendant; SEMINOLE NATION OF OKLAHOMA, Intervener and Appellant.
Docket No. G018179.
Court of Appeals of California, Fourth District, Division Three.
May 31, 1996.
*1484 COUNSEL
Sylvia L. Paoli, under appointment by the Court of Appeal, for Intervener and Appellant.
Laurence M. Watson, Chief Assistant County Counsel, and Michelle Ben-Hur, Deputy County Counsel, for Plaintiff and Respondent.
Harold LaFlamme, under appointment by the Court of Appeal, and John L. Dodd for Minor.
OPINION
WALLIN, J.
The Seminole Nation of Oklahoma (the SNO) appeals from the judgment terminating the parental rights of Renea Y., an enrolled tribal member, to her daughter, Alexandria. The SNO contends the trial court violated the Indian Child Welfare Act (hereinafter ICWA or Act) by failing *1485 to transfer jurisdiction of the proceedings to the SNO and failing to follow the ICWA placement preferences. We find the trial court properly refused to apply the provisions of the ICWA because neither Alexandria nor Renea had any significant social, cultural or political relationship with Indian life; thus, there was no existing Indian family to preserve.

Facts
Alexandria Y. was born in December 1990 with cocaine in her system. She was immediately taken into custody by the Orange County Social Services Agency (SSA) and was placed in an emergency shelter home. She was declared a dependent of the juvenile court under Welfare and Institutions Code section 300, subdivisions (a) and (b) in February 1991. In August, when Alexandria was seven months old, she was moved to the home of the T.'s, an Hispanic family,[1] where she has lived ever since. In September, the six-month review hearing was held. SSA had been unable to locate either parent and neither of them had contacted or visited Alexandria. The trial court terminated reunification services and set a selection and implementation hearing for December 1991.
In October, SSA discovered that Renea was an enrolled member of the SNO, making Alexandria eligible for enrollment and potentially subject to the ICWA. It was determined that Renea is one-eighth Seminole Indian; she was adopted as a toddler by a non-Indian family. The selection and implementation hearing was continued several times to accommodate the notice requirements of the ICWA, and the SNO indicated its intent to intervene in the proceedings by letter dated February 11, 1992. It expressly stated it did "not wish to transfer these state court proceedings to tribal court," but requested that the trial court follow the placement preferences of the ICWA. The SNO (and, for the first time, Renea) appeared on March 31. The SNO again requested the placement preferences be followed, and in May counsel was appointed to represent it. In June, the trial court held a hearing to determine whether Alexandria was an Indian child as defined by the ICWA.[2] After several days of testimony, the trial court concluded that she was, but found the ICWA inapplicable because the SNO's criteria for membership was not based on a quantum of blood analysis and was, therefore, unreasonable.[3]
The SNO filed for writ relief in this court, arguing that once a minor is determined to be an "Indian child" as defined by the ICWA, the juvenile *1486 court has no jurisdiction to consider the reasonableness of such determination. (1) (See fn. 4.) This court agreed, and issued a peremptory writ of mandate directing the trial court to recognize "SNO's determination that Alexandria is an Indian child and therefore entitled to placement preference under section 1915, subdivision (b) [fn. omitted]." (Seminole Nation of Oklahoma v. Superior Court (July 31, 1992) G012836 [nonpub. opn.].)[4]
When proceedings resumed, the mother filed a petition to transfer Alexandria's case to the tribal court. (25 U.S.C. § 1911(b).) The trial court set a hearing on the issue of whether good cause existed to deny the transfer petition, followed by the trailing selection and implementation hearing, for September 21. The trial court notified the SNO of the transfer petition by letter, stating, "Please be advised that the mother of [Alexandria] ... has ... filed a PETITION FOR TRANSFER OF CASE TO TRIBAL COURT.... [¶] Pursuant to the Indian Child Custody Guidelines, C. 4. (b), you have twenty days from the receipt of this notice of proposed transfer to decide whether to decline the transfer. [¶] You may inform this court, per the Guidelines, of your decision orally, or in writing." SNO petitioned the tribal court to accept jurisdiction, and Chief Magistrate Tah-Bone, thinking the trial court had already transferred jurisdiction, issued an order accepting jurisdiction on September 8.
On September 21, the SNO orally joined in Renea's petition to transfer, and Renea orally joined in the SNO's motion to enforce the ICWA placement preferences. The hearing on the transfer motion commenced and continued for several days over a three-month period. Dr. Roberto Flores de Apodaca, a clinical child psychologist, testified he had performed a bonding study on Alexandria and her foster parents when Alexandria was about 15 months old. He observed that a "secure bonding or attachment had taken place" between them, providing Alexandria with a sense of security which was critical to her optimum development. Removing her from her placement with the T. family would probably cause her to "suffer negative emotional consequences" manifested by "emotional withdrawal ..., indiscriminate friendliness or provocative behavior...." Dr. Apodaca performed a supplemental bonding study in November, and testified there was still a strong *1487 bond between Alexandria and her foster parents. He opined she was even more vulnerable to emotional damage from a separation than he had initially thought, and it was likely she would suffer detrimental effects if she were to be removed from the T. family.
Dr. Dixie Noble, a Native American psychologist, testified that she believed, based on reading studies performed by others, "Native American children who grow up in non-Indian homes have greater difficulties later on when the issue of identity becomes important in adolescence." After hearing the testimony and argument, the trial court denied the petition for transfer, finding the petition was untimely and that transfer would result in an inconvenient forum for the hearing on termination of parental rights and would be contrary to the best interests of the child.
The selection and implementation hearing concluded in March 1993. The trial court selected adoption as Alexandria's permanent plan and terminated Renea's parental rights. The trial court then found there was good cause, beyond a reasonable doubt, not to enforce the ICWA placement preferences. Its determination was based on the record of all proceedings in the case since December 1991, specifically including the prior testimony of Drs. Apodaca and Noble. Both Renea and the SNO appealed.
In January 1994, this court filed an unpublished opinion reversing the judgment terminating Renea's parental rights. We found it was error to terminate reunification services and schedule the selection and implementation hearing after the six-month review hearing when jurisdiction over Alexandria had not been based on abandonment. (Welf. & Inst. Code, §§ 300, subd. (g), 366.21, subd. (e).) We remanded the case for a new six-month hearing and noted: "Our disposition of this issue eliminates the need to address several of the other issues raised by Renea and the Seminole Nation of Oklahoma." (In re Alexandria Y. (Jan. 31, 1994) G013944 [non-pub. opn.].) Both SSA and Alexandria filed petitions for rehearing, urging us to address the ICWA issues because they would be relevant on remand. Both petitions were denied. A petition for review in the Supreme Court was also denied. The remittitur issued on May 9, 1994.[5]
After several continuances to accommodate the reappointment of counsel, the adoption of a reunification plan for Renea, and notice requirements, a *1488 new 12-month hearing was held in February 1995. Shortly before the hearing, Renea filed a petition for transfer of jurisdiction to the tribal court. At the hearing, the SNO expressly declined to join in the petition. The trial court denied the petition, erroneously finding the October 1992 order denying transfer was res judicata and thus could not be reconsidered; it also reaffirmed the previous bases for denial, finding the petition was untimely, and that transfer would result in an inconvenient forum and be contrary to Alexandria's best interests. The trial court then addressed the 12-month review issues. The social worker reported she had received a letter from Renea expressing her desire to relinquish her parental rights to Alexandria and to have the child adopted by her present caretakers. The trial court terminated reunification services and set a selection and implementation hearing for June 1995.
On June 15, the SNO filed a motion requesting a change in Alexandria's placement based on the ICWA preferences. On June 20, the court denied the motion on several grounds: (1) no Indian family existed to which the provisions of the ICWA could be applied; (2) the preferences were unconstitutional in that they denied Alexandria equal protection of the law based on race; (3) the issue of placement preferences was res judicata, having been previously decided by the trial court and not ruled on by this court in the prior appeal; (4) neither the original nor the present request to apply the ICWA preferences was filed in a timely manner.
The trial court then conducted the selection and implementation hearing. All parties stipulated the permanency issues would be decided based on the 12-month review findings, the prior testimony of Dr. Apodaca, and the most current SSA report. The trial court made the necessary findings, terminated Renea's parental rights and ordered Alexandria to be placed for adoption.

Discussion
(2) The SNO levels a host of challenges at the trial court proceedings, but the most significant is the viability of the judicially created "existing Indian family doctrine." There is a split on this issue, both nationally and in California. For the reasons explained below, we follow those cases refusing to apply the ICWA unless the Indian child or at least one of his parents has a significant social, cultural or political relationship with Indian life.
The ICWA (25 U.S.C. § 1901 et seq.)[6] was enacted in 1978. It "was the product of rising concern in the mid-1970's over the consequences to Indian *1489 children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes." (Mississippi Choctaw Indian Band v. Holyfield (1989) 490 U.S. 30, 32 [104 L.Ed.2d 29, 36, 109 S.Ct. 1597].) Testimony of Calvin Isaac, tribal chief of the Mississippi Band of Choctaw Indians, at congressional hearings indicated that tribal sovereignty in the socially and culturally determinative area of family relationships was being undermined by authorities who lacked an understanding of the Indian way of life. "`One of the most serious failings of the present system is that Indian children are removed from the custody of their natural parents by nontribal government authorities who have no basis for intelligently evaluating the cultural and social premises underlying Indian home life and childrearing. Many of the individuals who decide the fate of our children are at best ignorant of our cultural values, and at worst contemptful of the Indian way and convinced that removal, usually to a non-Indian household or institution, can only benefit an Indian child.' [(Hearings on Sen. Bill No. 1214 before the Subcommittee on Indian Affairs and Public Lands of the House Committee on Interior and Insular Affairs, 95th Cong., 2d Sess. (1978) at pp. 191-192.)]" (Id. at pp. 34-35 [104 L.Ed.2d at p. 38, 109 S.Ct. 1601].)[7]
The ICWA sets forth a congressional declaration of policy: "The Congress hereby declares that it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs." (§ 1902.) The Act provides an Indian tribe shall have exclusive jurisdiction over custody proceedings involving an Indian child who resides or is domiciled within the reservation (§ 1911(a)), and the state court shall, upon petition and in the absence of good cause to the contrary, transfer proceedings for foster care placement or termination of parental rights involving a nondomiciliary Indian child to the *1490 tribe (§ 1911(b)). If the proceedings remain in state court, the tribe has the right to intervene. (§ 1911(c).) The Act provides that no involuntary termination of parental rights to an Indian child may be ordered unless the court determines, based on proof beyond a reasonable doubt, including the testimony of expert witnesses, that continued custody of the child by the parent is likely to result in serious emotional or physical damage. (§ 1912(f).) Absent good cause to the contrary, placement preference shall be given to: (1) a member of the Indian child's extended family; (2) a foster home approved by the child's tribe; (3) an Indian foster home approved by a non-Indian authority; or (4) a children's institution approved by an Indian tribe. (§ 1915(b).)
Cases following the "existing Indian family doctrine" refuse to apply the ICWA to situations where an Indian child is not being removed from an existing Indian family, because in that situation the underlying policies of the ICWA are not furthered. The perception of "Indian family" has differed from court to court. One group of cases has refused to apply the ICWA where the Indian child himself has never lived in an Indian family and has had no association with Indian culture, even though his biological parent has had such associations. (See, e.g., Matter of Adoption of Baby Boy L. (1982) 231 Kan. 199 [643 P.2d 168]; Matter of Adoption of T.R.M. (Ind. 1988) 525 N.E.2d 298; In Interest of S.A.M. (Mo. 1986) 703 S.W.2d 603; Matter of Adoption of Baby Boy D (Okla. 1985) 742 P.2d 1059.)
In Baby Boy L., the first case to articulate the doctrine, the baby was the illegitimate child of a non-Indian mother, who voluntarily surrendered him to a non-Indian family for adoption on the day of his birth. The biological father, who was incarcerated, objected to the adoption and requested custody. Because the father was five-eighths Kiowa Indian, the Kiowa Tribe of Oklahoma was notified, and it petitioned to intervene and to transfer jurisdiction. The Kansas Supreme Court stated, "A careful study of the legislative history behind the Act and the Act itself discloses that the overriding concern of Congress and the proponents of the Act was the maintenance of the family and tribal relationships existing in Indian homes and to set minimum standards for the removal of Indian children from their existing Indian environment. It was not to dictate that an illegitimate infant who has never been a member of an Indian home or culture, and probably never would be, should be removed from its primary cultural heritage and placed in an Indian environment over the express objections of its non-Indian mother. Section 1902 of the Act makes it clear that it is the declared policy of Congress that the Act is to adopt minimum federal standards `for the removal of Indian children from their (Indian) families.' Numerous provisions of the Act support our conclusion that it was never the intent of *1491 Congress that the Act would apply to a factual situation such as is before the court." (Matter of Adoption of Baby Boy L, supra, 643 P.2d at p. 175.)
In Baby Boy D, the Oklahoma Supreme Court likewise found the ICWA inapplicable to an unwed Indian father who sought to invalidate an adoption accomplished with the non-Indian mother's consent. Although the father had attended an Indian school and had other contacts with his tribe, the court found the child was not being removed from an existing Indian family unit. "Here we have a child who has never resided in an Indian family, and who has a non-Indian mother." (Matter of Adoption of Baby Boy D, supra, 742 P.2d 1059, 1064.) In In Interest of S.A.M., a Missouri court also followed Baby Boy L. and refused to apply the ICWA where an unwed "full-blooded" Kickapoo Indian father sought custody of his seven-year-old daughter after the non-Indian mother's parental rights were involuntarily terminated. The father was not aware of the child's existence until she was almost seven, and the two had visited only twice before the litigation. She had severe emotional problems and was mentally handicapped. The court found the relationship between the father and daughter "does not constitute an `Indian family' of the type mentioned in [ICWA]." (In Interest of S.A.M., supra, 703 S.W.2d at p. 608.) And in Adoption of T.R.M., the Indiana Supreme Court found the ICWA inapplicable to an attempt by the Oglala Sioux Indian Tribe and the Indian mother to revoke her consent to the adoption of her daughter by a non-Indian couple. Although the child had not been formally adopted by the couple until the mother sought her return, she had lived with them as their daughter for seven years. The court held, "In the case before us, the child's biological ancestry is Indian. However, except for the first five days after birth, her entire life of seven years to date has been spent with her non-Indian adoptive parents in a non-Indian culture. While the purpose of the ICWA is to protect Indian children from improper removal from their existing Indian family units, such purpose cannot be served in the present case before this Court.... [W]e cannot discern how the subsequent adoption proceeding constituted a `breakup of the Indian family.'" (Matter of Adoption of T.R.M., supra, 525 N.E.2d at p. 303.)
Other cases have looked beyond the Indian ties of the child to those of the parents when considering the existing Indian family exception to the applicability of the ICWA. In Matter of Adoption of Crews (1992) 118 Wn.2d 561 [825 P.2d 305], the mother, who discovered some Indian heritage after the birth of her child, sought to revoke her consent to the child's adoption. The Washington Supreme Court reviewed the purposes of the ICWA and concluded there was no existing Indian family unit where "[n]either [the mother] nor her family has ever lived on the ... reservation in Oklahoma and there are no plans to relocate the family.... [The father] has no ties to any *1492 Indian tribe or community and opposes [the child's] removal from his adoptive parents. Moreover, there is no allegation by [the mother] or the [tribe] that, if custody were returned to [the mother], [the child] would grow up in an Indian environment. To the contrary, [the mother] has shown no substantive interest in her Indian heritage in the past and has given no indication this will change in the future." (Id. at p. 310.) In Hampton v. J.A.L. (La. Ct. App. 1995) 658 So.2d 331, the mother was 11/16 Indian and was a member of her father's tribe. She was born on the reservation of her mother's tribe and lived there for nine years, but had not since maintained any ties to either tribe. She agreed to the adoption of her child by a non-Indian couple, who took custody the day after the birth. Six months later, the mother sought to revoke her consent under the ICWA. Citing Baby Boy L., Crews, and T.R.M., the Louisiana appellate court found the adoption would not cause the breakup of an existing Indian family or removal of a child from an Indian environment. "The child has never participated in Indian culture or heritage and more importantly based on the evidence presented, would not be exposed to such culture in the future even if returned to her biological mother or her family." (Hampton v. J.A.L., supra, 658 So.2d at p. 337.)
In re Bridget R. (1996) 41 Cal. App.4th 1483 [49 Cal. Rptr.2d 507], the most recent case on the existing Indian family doctrine, involved a voluntary relinquishment of twins for adoption. The mother was not a Native American, but the father was recognized as a member of the Pomo Indian Tribe, whose reservation is in Northern California. The parents lived in Los Angeles County at the time of the births. Upon the execution of the relinquishment documents, the twins were immediately placed with their adoptive family, who returned with them to their home in Ohio where they have remained ever since. The father subsequently petitioned to have his voluntary relinquishment rescinded as not in compliance with the ICWA. (§§ 1913(a), 1914.) Declining to apply the existing Indian family doctrine, the trial court invalidated the relinquishments, and ordered the twins removed from their adoptive family and returned to the custody of the father's extended family.
After extensive analysis, the appellate court reversed, holding that recognition of the existing Indian family doctrine was necessary to preserve the ICWA's constitutionality. "We hold that under the Fifth, Tenth and Fourteenth Amendments to the United States Constitution, ICWA does not and cannot apply to invalidate a voluntary termination of parental rights respecting an Indian child who is not domiciled on a reservation, unless the child's biological parent, or parents, are not only of American Indian descent, but also maintain a significant social, cultural or political relationship with their tribe." (In re Bridget R., supra, 41 Cal. App.4th at p. 1492.) The court *1493 concluded that the application of the Act under these circumstances would thwart its purpose of preserving Indian culture through the preservation of Indian families and would violate the Constitution by: (1) impermissibly intruding upon a power ordinarily reserved to the states; (2) interfering with Indian children's fundamental due process rights respecting family relationships; and (3) depriving Indian children of equal opportunities to be adopted and exposing them to an unequal chance of having non-Indian families torn apart based solely on race, in the absence of a compelling state purpose. Because the trial court had not taken evidence on whether the biological parents maintained "significant social, cultural or political relationships" with the tribe, the case was remanded for a determination on that issue.[8]
We agree with Bridget R. that recognition of the existing Indian family doctrine is necessary to avoid serious constitutional flaws in the ICWA. But we disagree with its holding that the doctrine cannot come into play unless the child and both his parents lack a significant relationship with Indian life. We are not willing to so limit the doctrine. As demonstrated by our review of the cases, whether there is an existing Indian family is dependent on the unique facts of each situation.
Nor must the existing Indian family be limited as suggested in Bridget R.. Contrary to the view of the Bridget R. court (41 Cal. App.4th at p. 1500), a broader interpretation of the doctrine has not been impliedly rejected by the Supreme Court in Mississippi Choctaw Indian Band v. Holyfield, supra, 490 U.S. 30 [104 L.Ed.2d 29, 109 S.Ct. 1597]. Holyfield involved twin babies whose parents lived on the reservation and were enrolled members of the tribe. The babies were born 200 miles from the reservation and were voluntarily relinquished for adoption to a non-Indian couple, who adopted them in state court. The trial court found the twins were not domiciled on the reservation because they had never been physically present there; thus, the tribal court did not have exclusive jurisdiction of the proceedings under section 1911(a). The Supreme Court disagreed. It held that the domicile of minors is generally the domicile of their parents; thus, the twins were domiciled on the reservation and the tribal court had exclusive jurisdiction.
Holyfield did not reject any form of the existing Indian family doctrine. It dealt with reservation-domiciled Indian parents who had left the reservation *1494 temporarily for the birth of their children so they could relinquish them for adoption and avoid the application of the ICWA. The Supreme Court held the application of the exclusive jurisdiction provisions of the ICWA could not be defeated by the acts of the parents. (490 U.S. at p. 49 [104 L.Ed.2d at p. 47, 109 S.Ct. at pp. 1608-1609].)
Furthermore, the facts of the case before us do not require us to hold, in the abstract, that the existing Indian family exception will not apply (in other words, the ICWA will apply) if one of an Indian child's biological parents, no matter how removed from the child's life, has maintained a connection to Indian life that a trial court deems significant. Here, the ICWA is not applicable under any version of the doctrine. Neither Alexandria nor Renea has any relationship with the SNO, let alone a significant one. Renea was raised by a non-Indian family, and her extended family is non-Indian. The issue of the existing Indian family doctrine was fully litigated below, but no evidence was presented to suggest Renea had ever been exposed to her Indian heritage as a child or pursued such an interest as an adult. The father is Hispanic, and Alexandria is placed in a preadoptive Hispanic home where Spanish is spoken. Under these circumstances, it would be anomalous to allow the ICWA to govern the termination proceedings. It was clearly not the intent of the Congress to do so.
On the basis of the existing Indian family doctrine, we affirm the trial court's refusal to transfer jurisdiction to the SNO and to apply the ICWA's placement preferences.[9] The judgment terminating Renea's parental rights is affirmed.
Sills, P.J., concurred.
CROSBY, J., Concurring.
While I concur in the result in this case and some of the court's reasoning, I decline to endorse the majority's gratuitous criticism of In re Bridget R. (1996) 41 Cal. App.4th 1483 [49 Cal. Rptr.2d 507]. (Maj. opn., ante, at p. 1493.)
Appellant's petition for review by the Supreme Court was denied September 18, 1996.
NOTES
[1] Alexandria's father is Hispanic.
[2] An Indian child is defined as "any unmarried person who is under age eighteen and is ... eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4)(b).)
[3] Membership in the SNO is open to those who can prove their blood relationship, no matter what the degree, to one of the Seminole Indians named on a tribal list prepared around 1900.
[4] The SNO claims this holding is law of the case and dispositive of the question whether the trial court should have applied ICWA's placement preferences. But the doctrine of law of the case does not apply where the appellate court is considering a ground that was not raised in the prior appellate proceeding. (Searle v. Allstate Life Ins. Co. (1985) 38 Cal.3d 425, 435 [212 Cal. Rptr. 466, 696 P.2d 1308].) The issue before us in the writ proceeding was narrowly framed: "Once a minor is determined to be an `Indian child' as defined by the ICWA, does the juvenile court have jurisdiction to inquire into the reasonableness of such determination?" (Seminole Nation of Oklahoma v. Superior Court, supra, G012836.) The "Indian child" determination was a threshold issue in this case; none of the considerations involved in applying the placement preferences or other provisions of the ICWA had yet been presented to the trial court, let alone this court, at the time of the writ proceeding.
[5] Both Alexandria and SSA argue because we did not order Alexandria removed from the T. family home and placed with an Indian family in the first appeal, we impliedly approved her placement. Thus, they claim, the propriety of her placement is now law of the case. But the effect of our reversal was to place the case back at the six-month hearing stage, before the SNO became involved and any of the ICWA issues were raised. The posture of the case was as if none of the subsequent hearings had been held. (Barnes v. Litton Systems, Inc. (1994) 28 Cal. App.4th 681, 683-684 [33 Cal. Rptr.2d 562].) Although we could have addressed the issue for the guidance of the trial court on remand, we chose not to. Our refusal to speak gratuitously to an issue does not render it law of the case.
[6] All further statutory references are to title 25 of the United States Code, ICWA.
[7] Congress enacted findings in the ICWA that reflect the gist of the testimony: "Recognizing the special relationship between the United States and the Indian tribes and their members and the Federal responsibility to Indian people, the Congress finds  [¶]... [¶] "(4) that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions; and ¶ (5) that the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families." (§ 1901.)
[8] Two additional California cases have recognized the doctrine, but neither relied on it as a basis for the decision. (In re Baby Girl A. (1991) 230 Cal. App.3d 1611 [282 Cal. Rptr. 105]; In re Wanomi P. (1989) 216 Cal. App.3d 156 [264 Cal. Rptr. 623].) And two California cases have refused to apply the doctrine where only the child's Indian contact was considered. (Adoption of Lindsay C. (1991) 229 Cal. App.3d 404 [280 Cal. Rptr. 194]; In re Junious M. (1983) 144 Cal. App.3d 786 [193 Cal. Rptr. 40].) Several other states have rejected the doctrine. (See, e.g., Matter of Adoption of T.N.F. (Alaska 1989) 781 P.2d 973; Matter of Baby Boy Doe (1993) 123 Idaho 464 [849 P.2d 925]; Matter of N.S. (S.D. 1991) 474 N.W.2d 96.)
[9] The SNO argues the case was actually transferred to it in September 1992 when the trial court notified the tribal court of the mother's petition and the tribal court issued an order accepting jurisdiction. This argument must fail because the letter from the trial court could not function as an order. Chief Magistrate Tah-Bone thought the trial court was transferring jurisdiction, and the trial court thought it would see if the tribal court wanted jurisdiction before it held a good cause hearing. This was a misunderstanding and does not elevate a letter to the status of a binding order.