[No. F029316. Fifth Dist. June 24, 1998.]

In re ALICIA S. et al., Persons Coming Under the Juvenile Court Law.
KERN COUNTY DEPARTMENT OF HUMAN SERVICES, Plaintiff and
Respondent, v.
MISHIOLA S., Defendant and Appellant.

## COUNSEL

Beth A. Melvin, under appointment by the Court of Appeal, for Defendant and Appellant.

B. C. Barmann, Sr., County Counsel, and Paul E. Blackhurst, Deputy County Counsel, for Plaintiff and Respondent.

## OPINION

**BUCKLEY, J.**—Mishiola and Henry S. have four children, three of whom are the subjects of these proceedings: Henry, Jr. (born May 10, 1991); Andrew (born Dec. 17, 1992); and Alicia (born Mar. 7, 1994). Mishiola is three-eighths Paiute Indian and an enrolled member of the Paiute Tribe in Bishop, California. Henry S. is one-half Pima Indian and an enrolled member of the Gila River Indian Community in Sacaton, Arizona. The children are not eligible for membership in their mother's tribe but are eligible for membership in their father's tribe, and were enrolled in 1995.

Mishiola appeals from an order terminating her parental rights with respect to her three children. (Welf. & Inst. Code,[1] § 366.26.) Each is an "Indian child" as defined by the Indian Child Welfare Act of 1978 (25 U.S.C.A. § 1901 et seq.) (ICWA or the Act). However, the trial court found that neither Mishiola nor the children's father, Henry S., had any significant relationship with the Indian community, and so refused to apply the ICWA to these proceedings in reliance upon a judicial interpretation of the Act recognizing what has become known as the "existing Indian family doctrine." The validity of the doctrine has been the subject of considerable disagreement among the courts of this state and among the courts of other states. Some courts have embraced the doctrine; others have rejected it. As we shall explain in this opinion, we reject it.

## DISCUSSION

██ The ICWA establishes minimum federal standards, both procedural and substantive, governing the removal of Indian children from their families. It was "the product of rising concern in the mid-1970's over the

---

[1]Except as indicated, all further statutory references are to the Welfare and Institutions Code.

consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes." (*Mississippi Choctaw Indian Band* v. *Holyfield* (1989) 490 U.S. 30, 32 [109 S.Ct. 1597, 1600, 104 L.Ed.2d 29].) These practices, estimated to have affected 25 to 35 percent of all Indian children, were attributed principally to a structural misunderstanding of Indian values. (*Id.* at pp. 32-34 [109 S.Ct. at pp. 1599-1601].)

" 'One of the most serious failings of the present system is that Indian children are removed from the custody of their natural parents by nontribal government authorities who have no basis for intelligently evaluating the cultural and social premises underlying Indian home life and childrearing. Many of the individuals who decide the fate of our children are at best ignorant of our cultural values, and at worst contemptful of the Indian way and convinced that removal, usually to a non-Indian household or institution, can only benefit an Indian child.' [Testimony of Calvin Isaac, Tribal Chief of the Mississippi Band of Choctaw Indians, at hearings on Sen. Bill No. 1214 before the Subcommittee on Indian Affairs and Public Lands of the House Committee on Interior and Insular Affairs, 95th Cong., 2d Sess. (1978) at pp. 191-192.]" (*Mississippi Choctaw Indian Band* v. *Holyfield*, *supra*, 490 U.S. at pp. 34-35 [109 S.Ct. at p. 1601].)

Similar concerns are reflected in the congressional findings incorporated into the ICWA. Congress found, for example, "(5) that the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families." (25 U.S.C.A. § 1901.)

The ICWA provides for a system of dual state and tribal jurisdiction over Indian child custody proceedings. Tribal courts have exclusive jurisdiction over proceedings involving Indian children who reside or are domiciled on the reservation. (25 U.S.C.A. § 1911(a).) Concurrent but presumptively tribal jurisdiction exists in the case of children not domiciled on the reservation; on petition of either parent or the child's tribe, state court proceedings for foster care placement or termination of parental rights must be transferred to the tribal court unless "good cause" exists, either parent objects, or the tribe declines jurisdiction. (25 U.S.C.A. § 1911(b).) If the matter is not transferred to a tribal court, the tribe has the right to intervene in the state court proceedings at any time. (25 U.S.C.A. § 1911(c).)

Sections 1912 and 1913 of the Act, respectively, govern involuntary and voluntary state court proceedings to place an Indian child in foster care or

terminate parental rights. In an involuntary proceeding like the one now before us, the tribe is entitled to formal notice of the action "where the court knows or has reason to know that an Indian child is involved." (25 U.S.C.A. § 1912(a).) Further, "[n]o termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." (25 U.S.C.A. § 1912(f).) And in any adoptive placement of an Indian child under state law, a preference must be given, in the absence of good cause to the contrary, to placement with a member of the child's extended family, with other members of the child's tribe, or with other Indian families. (25 U.S.C.A. § 1915(a).) Similar preferences apply to foster care and preadoptive placements. (25 U.S.C.A. § 1915(b).)

These provisions apply to all child custody proceedings involving an Indian child. A "child custody proceeding" is defined to include any proceeding involving foster care placement, termination of parental rights, preadoptive placement, or adoptive placement. (25 U.S.C.A. § 1903(1).) An "Indian child" means "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C.A. § 1903(4).) Henry, Jr., Andrew, and Alicia are, without dispute, "Indian children" involved in a "child custody proceeding."

Notwithstanding these statutory definitions, some courts have refused to apply the ICWA unless an Indian child is being removed from an "existing Indian family," meaning generally a family with a significant connection to the Indian community. These courts reason that Congress never intended the ICWA to apply in other situations where its application would do nothing to further the Act's underlying purpose of preserving Indian culture. The first case to adopt this reasoning was *Matter of Adoption of Baby Boy L.* (1982) 231 Kan. 199 [643 P.2d 168], which involved the out-of-wedlock child of a non-Indian mother and an Indian father. The mother voluntarily relinquished the child at birth for adoption by a specific non-Indian couple, whereupon the father and his tribe invoked the ICWA in an effort to obtain custody of the child for himself or his extended family. The Kansas Supreme Court, while acknowledging that the ICWA would otherwise apply, found that its purposes would not have been served in this situation.

"A careful study of the legislative history behind the Act and the Act itself discloses that the overriding concern of Congress and the proponents of the Act was the maintenance of the family and tribal relationships existing in

Indian homes and to set minimum standards for the removal of Indian children from their existing Indian environment. It was not to dictate that an illegitimate infant who has never been a member of an Indian home or culture, and probably never would be, should be removed from its primary cultural heritage and placed in an Indian environment over the express objections of its non-Indian mother." (*Matter of Adoption of Baby Boy L., supra,* 643 P.2d at p. 175.)

In the next few years, several other state courts took a similar position, while still others rejected the existing Indian family doctrine as contrary to the plain language of the Act.[2]

The courts which embrace the doctrine proceed, in part, on the basis that the United States Supreme Court has never directly addressed the issue. By that rationale, they discount the significance of *Mississippi Choctaw Indian Band* v. *Holyfield, supra,* 490 U.S. 30, the only Supreme Court case to address the ICWA in any context.[3] In fact, *Mississippi Choctaw Indian Band* v. *Holyfield, supra,* does not address the existing Indian family doctrine directly; however, in the opinion, the court gives significant insight into the Act and the court's feeling about the propriety, in general, of state interpretation of it.

In *Mississippi Choctaw Indian Band* v. *Holyfield, supra,* 490 U.S. 30, two unwed Indian parents who resided on the Choctaw reservation purposely traveled some distance away to give birth to twins and to place them for adoption by a non-Indian couple. The question then was whether the children were "domiciled" on the reservation such that the tribal court had exclusive jurisdiction over the custody proceedings, and more particularly whether federal or state law should be applied in making that determination. The court concluded "it [is] beyond dispute that Congress intended a uniform federal law of domicile for the ICWA." (*Id.* at p. 47 [109 S.Ct. at p. 1607], fn. omitted.) It gave two reasons for this conclusion.

"First, and most fundamentally, the purpose of the ICWA gives no reason to believe that Congress intended to rely on state law for the definition of a critical term; quite the contrary. . . . Indeed, the congressional findings that

---

[2]Rather than set forth a survey of cases nationally which have either accepted or rejected the doctrine, we will simply cite *Crystal R.* v. *Superior Court* (1997) 59 Cal.App.4th 703 [69 Cal.Rptr.2d 414] and the voluminous list of cases cited therein for that purpose.

[3]In *Matter of Adoption of Crews* (1992) 118 Wn.2d 561 [825 P.2d 305, 310], the Washington State court states that *Holyfield* implicitly *supports* the doctrine. However, in concluding this, the court in *Crews* extrapolates from *Holyfield* a sentence which is out of context, that "[r]emoval of Indian children from their *cultural setting* seriously impacts long-term tribal survival . . . ." (Italics added.) This phrase is in context of parents who purposefully left the reservation to have their child so as to facilitate adoption by the Holyfields. (*Mississippi Choctaw Indian Band* v. *Holyfield, supra,* 490 U.S. at pp. 50-51 [109 S.Ct. at p. 1609].)

are a part of the statute demonstrate that Congress perceived the States and their courts as partly responsible for the problem it intended to correct. [Citation.] Under these circumstances, it is most improbable that Congress would have intended to leave the scope of the statute's key jurisdictional provision subject to definition by state courts as a matter of state law.

"Second, Congress could hardly have intended the lack of nationwide uniformity that would result from state-law definitions of domicile." *(490 U.S. at pp. 44-45 [109 S.Ct. at pp. 1606-1607], fns. omitted.)*

The court then went on to explain that federal law, borrowing from established common law principles, ordinarily considers a minor's domicile to be that of its parents, and in the case of an illegitimate child, to be that of its mother. Accordingly, the court found that the children were domiciled on the reservation even though they had never been there. *(Mississippi Choctaw Indian Band* v. *Holyfield, supra*, 490 U.S. at pp. 47-49 [109 S.Ct. at pp. 1607-1609].) Moreover, it made no difference that the parents had gone to some lengths to place the children outside the reservation. This was so, the court said, because the ICWA reflects congressional concern "not solely about the interests of Indian children and families, but also about the impact on the tribes themselves of the large numbers of Indian children adopted by non-Indians." (490 U.S. at p. 49 [109 S.Ct. at pp. 1608-1609].) " 'The protection of this tribal interest is at the core of the ICWA, which recognizes that the tribe has an interest in the child which is distinct from but on a parity with the interest of the parents.' " *(Id.* at p. 52 [109 S.Ct. at p. 1610], quoting *Matter of Adoption of Halloway* (Utah 1986) 732 P.2d 962, 969-970.) And, the court added, Indian children have a corresponding interest in maintaining a relationship with the tribe even if their parents do not. "[I]t is clear that Congress' concern over the placement of Indian children in non-Indian homes was based in part on evidence of the detrimental impact on the children themselves of such placements outside their culture." (490 U.S. at pp. 49-50 [109 S.Ct. at pp. 1608-1609], fn. omitted.)[4]

The California courts are also divided over the existing Indian family doctrine. In *In re Junious M.* (1983) 144 Cal.App.3d 786 [193 Cal.Rptr. 40], a case from the First Appellate District, the trial court refused to apply the ICWA in a proceeding to terminate parental rights under former Civil Code section 232, based in part on its determination that the minor "had developed no identification as an Indian." (144 Cal.App.3d at p. 796.) The Court of

[4]"In large part the concerns that emerged during the congressional hearings on the ICWA were based on studies showing recurring developmental problems encountered during adolescence by Indian children raised in a white environment." *(Mississippi Choctaw Indian Band* v. *Holyfield, supra*, 490 U.S. at p. 50, fn. 24 [109 S.Ct. at p. 1609]; see also *id.* at p. 33, fn. 1 [109 S.Ct. at p. 1600].)

Appeal noted, however, that "[t]he language of the Act contains no such exception to its applicability, and we do not deem it appropriate to create one judicially." (*Ibid.*) Further:

"Even if judicial creation of exceptions to the Act were permissible, creation of one where the child has been deprived of development of an Indian identity would not be appropriate. Congress has found that it has a responsibility to protect and preserve the Indian tribes and, their resources and 'that there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children . . . .' (§ 1901, subds. (2), (3).) It has therefore established a policy of attempting to place Indian children in '. . . homes which will reflect the unique values of Indian culture, . . .' (§ 1902.) Thus a major purpose of the Act would be undermined by such an exception." (144 Cal.App.3d at p. 796.)

The same court revisited the issue after *Holyfield* in *Adoption of Lindsay C.* (1991) 229 Cal.App.3d 404 [280 Cal.Rptr. 194], with similar results. In an action to terminate the parental rights of an Indian father who had had little contact with his three-year-old daughter, the court held application of the ICWA's notice requirements "is in keeping with the tenor of *Holyfield* which stresses consideration of not only the wishes of the parents, but the well-being and interests of the child and the tribe." (*Id.* at p. 416; see also *In re Crystal K.* (1990) 226 Cal.App.3d 655, 666 [276 Cal.Rptr. 619] (Third Appellate District) ["Limiting the Act's applicability solely to situations where nonfamily entities physically remove Indian children from actual Indian dwellings deprecates the very links—parental, tribal and cultural— the Act is designed to preserve."].)

More recently, the Second, Fourth, and Sixth Appellate Districts have approved the existing Indian family doctrine.[5] In *In re Bridget R.* (1996) 41 Cal.App.4th 1483 [49 Cal.Rptr.2d 507], the parents of newborn twins voluntarily relinquished their parental rights and placed the children for adoption by a non-Indian couple. About a year later, the father disclosed his Indian heritage for the first time and invoked the Act in an effort to invalidate the relinquishment and place the children within his extended family. The trial court entered orders to that effect, and the Court of Appeal reversed. The appellate court found in these circumstances that the children's right to a stable and permanent home had assumed constitutional dimensions, and therefore concluded, under principles of substantive due process, equal protection, and federalism, that: "[the ICWA] can properly

---

[5]Two other California cases have recognized the doctrine without relying on it. (*In re Baby Girl A.* (1991) 230 Cal.App.3d 1611, 1620-1621 [282 Cal.Rptr. 105]; *In re Wanomi P.* (1989) 216 Cal.App.3d 156, 168 [264 Cal.Rptr. 623].)

apply only where it is necessary and actually effective to accomplish its stated, and plainly compelling, purpose of preserving Indian culture through the preservation of Indian families. We agree with those courts which have held that ICWA's purpose is not served by an application of the Act where the child may be of Indian descent, but where neither the child *nor either parent* maintains any significant social, cultural or political relationships with Indian life." (41 Cal.App.4th at p. 1512.) The matter was remanded to the trial court for further proceedings to determine whether the parents had, in fact, maintained significant ties to the Indian community. (41 Cal.App.4th at p. 1523.)[6]

*In re Alexandria Y.* (1996) 45 Cal.App.4th 1483 [53 Cal.Rptr.2d 679] concerned the trial court's refusal to apply the Act's tribal jurisdiction and placement preference provisions in a dependency proceeding. The Court of Appeal agreed with *Bridget R.* that "recognition of the existing Indian family doctrine is necessary to avoid serious constitutional flaws in the ICWA." (*In re Alexandria Y., supra,* 45 Cal.App.4th at p. 1493.) It affirmed the judgment, finding that neither the mother nor the child had any significant relationship with Indian life, and "thus, there was no existing Indian family to preserve." (*Id.* at p. 1485.)[7]

*Crystal R.* v. *Superior Court, supra,* 59 Cal.App.4th 703 involved the child of an Indian father who was frequently incarcerated, and a non-Indian mother who suffered from a drug problem. Consequently, the child spent several years as a dependent of the juvenile court in the care of her mother's aunt and uncle, who wished to adopt her. By the time the child was six years

---

[6]The court set out at some length the rules that were to govern these proceedings. It directed that the parents would bear the burden of proof on the issue; that the lower court's inquiry must focus on the parents' ties to the tribe, rather than on any relationship between the tribe and extended family members; and that the determination must be made as of the time the parents relinquished their parental rights. The court also identified several factors bearing on the determination.

"In considering whether the biological parents maintained significant ties to the Tribe, the court should also consider whether the parents privately identified themselves as Indians and privately observed tribal customs and, among other things, whether, despite their distance from the reservation, they participated in tribal community affairs, voted in tribal elections, or otherwise took an interest in tribal politics, contributed to tribal or Indian charities, subscribed to tribal newsletters or other periodicals of special interest to Indians, participated in Indian religious, social, cultural or political events which are held in their own locality, or maintained social contacts with other members of the Tribe." (*In re Bridget R., supra,* 41 Cal.App.4th at pp. 1514-1515.)

[7]*Alexandria Y.* disagreed with *Bridget R.*, however, regarding the scope of the existing Indian family doctrine. *Bridget R.* would limit the doctrine to those situations where neither the child nor either parent has a significant relationship with Indian life. *Alexandria Y.* proposed a broader rule "dependent on the unique facts of each situation" (*In re Alexandria Y., supra,* 45 Cal.App.4th at p. 1493), but found the ICWA inapplicable in that case under any version of the doctrine because the mother and child had no relationship with their tribe, "let alone a significant one." (*Id.* at p. 1494.)

old, the matter had reached a section 366.26 hearing, where the trial court determined the ICWA's heightened standards should apply. The child, and the aunt and uncle, then filed a petition for writ of mandate. The Court of Appeal granted the petition and directed the lower court to conduct a hearing of the sort described in *Bridget R.* to determine if the father had any significant ties to the Indian community. (59 Cal.App.4th at p. 724.) In reaching this result, the court sought to strike a balance between the shifting interests of the child, the parents, and the tribe.

"Where the state court proceeding has reached the point at which reunification has failed and the child's interests in permanent placement outweigh the interests of the parents, we believe it is appropriate for the court to examine the strength of the tribe's interests in protecting Indian cultural ties. If the evidence shows that such ties have become so attenuated as to be virtually nonexistent, it makes little sense to bring the requirements of the ICWA to bear on the proceedings. Not only does the application of the ICWA in such circumstances work against the best interests of the child, who is poised to move forward with his or her life as part of a stable family unit, it does nothing to further the purpose of preserving ' "the unique values of Indian culture." ' [Citation.]" (59 Cal.App.4th at p. 720.)

■■■ We share the court's concern for a dependent child's interests in permanence and stability, and agree these interests may in some cases outweigh the competing interests of the parents and the tribe. But we believe this concern can and should be accommodated by the ICWA without resort to the existing Indian family doctrine's strained interpretation of the Act. *Bridget R.*, *Alexandria Y.*, and *Crystal R.* all arose in circumstances where strict application of the Act's placement preferences would have caused an Indian child to be removed from the non-Indian home where she had spent most or all of her life and placed in an Indian environment with which she was completely unfamiliar. The Act, however, also permits the court to depart from the statutory preferences where good cause exists to do so.[8]

The ICWA does not define "good cause," and the published decisions have given the term somewhat varying interpretations. However, the determination generally involves the same sort of considerations that have prompted some courts to adopt the existing Indian family doctrine. For example, in *Matter of Adoption of F.H.* (Alaska 1993) 851 P.2d 1361, 1363-1364 [851 P.2d 1361], after acknowledging that a good cause determination is within the superior court's discretion, the appellate court affirmed a

---

[8]Section 1915(a) of the Act provides in part: "In any adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families."

trial court's deviation from the Act's placement preferences based upon the mother's preference for the prospective adopting parents, the bond between the minor and the prospective adopting mother, and the uncertainty of the minor's future if not adopted. In *Matter of Baby Boy Doe* (1995) 127 Idaho 452 [902 P.2d 477, 487], the court looked to the mother's wishes, the certainty of psychological and emotional trauma if the child was removed from the adoptive parents, the likelihood of emotional damage if the child had contact with the father while living with extended family, and the extraordinary physical or emotional needs as established by testimony of a qualified expert witness. And in *Adoption of M.* (1992) 66 Wn.App. 475 [832 P.2d 518, 522], the court enumerated the following factors: the best interests of the child, the wishes of the biological parents, the suitability of the persons preferred for placement, the child's ties to the tribe and the child's ability to make any cultural adjustments necessitated by the particular placement.[9] (But see *Matter of Custody of S.E.G.* (Minn. 1994) 521 N.W.2d 357, 361-363 ["[A] finding of good cause cannot be based simply on a determination that placement outside the preferences would be in the child's best interests."].)

Thus, the principal rationale for the existing Indian family doctrine loses much of its force in this situation. The "good cause" exception was intended to provide a state court with flexibility in determining the placement of an Indian child. (*In re Interest of Bird Head, supra,* 331 N.W.2d at p. 791.) Conversely, it implicitly establishes the limits of the court's discretion in applying the requirements of the ICWA. In short, it would appear the courts in *Bridget R., Alexandria Y.,* and *Crystal R.,* and in many other "existing Indian family" cases, could have reached the same result, albeit somewhat more circuitously, without having to rely on a judicially created exception to the ICWA that appears nowhere in the Act itself.[10]

■ When statutory language is clear and unambiguous there is no need for construction and courts should not indulge in it. (*Solberg* v. *Superior*

[9]Other cases that have considered this question include *Matter of Adoption of Riffle* (1996) 277 Mont. 388 [922 P.2d 510, 515]; *Yavapai-Apache Tribe* v. *Mejia* (Tex.App. 1995) 906 S.W.2d 152, 169; *In Interest of J.W.* (Iowa App. 1995) 528 N.W.2d 657; *People in Interest of J.L.P.* (Colo.App. 1994) 870 P.2d 1252, 1256-1259; *In re Interest of C.W.* (1992) 239 Neb. 817 [479 N.W.2d 105, 113-114]; *C.E.H.* v. *L.M.W.* (Mo.App.W.D. 1992) 837 S.W.2d 947, 952-955; *In re Baby Girl A., supra,* 230 Cal.App.3d at p. 1620; *In re Robert T.* (1988) 200 Cal.App.3d 657, 663 [246 Cal.Rptr. 168]; *Matter of Adoption of T.R.M.* (Ind. 1988) 525 N.E.2d 298; *Matter of Appeal in Maricopa County* (1983) 136 Ariz. 528 [667 P.2d 228, 234]; *In re Interest of Bird Head* (1983) 213 Neb. 741 [331 N.W.2d 785, 791]. See also Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67584 et seq. (Nov. 26, 1979).

[10]Indeed, *Alexandria Y.* began as a "good cause" case in which the trial court initially found there was good cause both to deny transfer to the tribal court and to apply the ICWA placement preferences. The court later relied on the existing Indian family doctrine as an

*Court* (1977) 19 Cal.3d 182, 198 [137 Cal.Rptr. 460, 561 P.2d 1148].) ▪ Congress has clearly defined the nature of the relationship an Indian child must have with a tribe in order to trigger application of the Act. There is no threshold requirement in the Act that the child must have been born into or be living with an existing Indian family, or must have some particular type of relationship with the tribe or his or her Indian heritage. "No amount of probing into what Congress 'intended' can alter what Congress *said*, in plain English, . . ." (*Matter of N.S.* (S.D. 1991) 474 N.W.2d 96, 100, fn. * (specially conc. opn. of Sabers, J.).)[11]

Moreover, we believe the existing Indian family doctrine conflicts with the ICWA's policy of protecting and preserving the interests of Indian tribes in their children. And it undermines the ICWA's purpose to establish uniform federal standards governing the removal of Indian children from their families. The determination whether an Indian child and/or his or her parents have any "significant" ties to Indian culture is, by its very nature, a highly subjective one that state courts are ill-equipped to make. It is "most improbable" that Congress meant to leave it to the states to determine whether to apply a statute intended to limit their power in Indian child custody proceedings. (*Mississippi Choctaw Indian Band* v. *Holyfield, supra,* 490 U.S. at p. 45 [109 S.Ct. at pp. 1606-1607].) "Engrafting a new requirement into ICWA that allows the dominant society to judge whether the parent's cultural background meets its view of what 'Indian culture' should be puts the state courts right back into the position from which Congress has removed them." (*Quinn* v. *Walters* (1993) 117 Or.App. 579, 584, fn. 2 [845 P.2d 206, 209]; *State, In Interest of D.A.C.* (Utah App. 1997) 933 P.2d 993, 999.)

The temptation proved to be irresistible in this case. Mishiola, who was about 23 years of age when her children were removed in 1994, lived with her grandparents on the Paiute reservation from ages 12 to 17. There she participated in tribal activities including gatherings, funerals, and elections. She met Henry, Sr., in 1990, and gave birth to their first child, Henry, Jr., about a year later. In the period from 1991 through 1993, she attended intertribal gatherings and powwows, utilized Indian social service agencies, and voted by mail in a tribal election. At home, she cooked Indian food,

---

additional basis for its decision, and the appellate court affirmed on that ground alone. (*In re Alexandria Y., supra,* 45 Cal.App.4th 1483.)

[11]It is worth noting that Congress rejected an earlier version of the ICWA that would have required, as a prerequisite to tribal court jurisdiction, that an Indian child not living on the reservation have "significant contacts" with the tribe. (See *In re Adoption of S.S.* (1995) 167 Ill.2d 250 [212 Ill.Dec. 590, 657 N.E.2d 935, 951-952] (dis. opn. of McMorrow, J.).)

spoke some Indian words, and dressed Henry, Jr., and Andrew in swaddling clothes until they were about six months old. She testified she attempted in these ways and others to make her children aware of their Indian heritage.[12]

Mishiola's involvement with the local Indian community declined in 1993 when she developed transportation problems, but resumed in 1995, about the same time Henry, Sr., also began to participate in Indian activities. Although an enrolled member of the Pima Tribe since age 10, Henry, Sr., had little contact with tribal affairs while growing up and took no particular interest in his Indian heritage before he met Mishiola. Until 1995 he worked as a truck driver and was often away from home, but since then he has attended yearly Indian powwows, enrolled in Indian programs to deal with his alcohol problem, and attended several "sweats."

In other words, this is not a case where "Indian children" have been removed from a home having no connection whatsoever to the Indian community.[13] Consequently, the trial court was left to decide, without any guidance or expertise, if the parents' Indian activities and beliefs were "significant" enough to warrant application of the ICWA. No evidence was presented describing Indian cultural practices generally, or explaining how the family's "Indianness" might be expected to manifest itself day to day. Nor is there any way to tell from the record whether and to what extent an Indian community exists in the Bakersfield area, or what opportunities it offers to participate in Indian affairs. In short, as this case amply demonstrates, the existing Indian family doctrine frustrates the policies underlying the ICWA by returning Indian child custody proceedings to a time before its enactment when " 'Indian children [were] removed from the custody of their natural parents by nontribal government authorities who have no basis for intelligently evaluating the cultural and social premises underlying Indian home life and childrearing.' " (*Mississippi Choctaw Indian Band* v. *Holyfield*, *supra*, 490 U.S. at pp. 34-35 [109 S.Ct. at p. 1601].)

It does not necessarily follow from this result that Mishiola's parental rights may not be terminated, or that Henry, Jr., Andrew, and Alicia must be

---

[12]The department argues that Mishiola's contacts with the Indian community are irrelevant because the children qualify as Indian children through their father's tribe. Not even the courts that have argued most forcefully for the existing Indian family doctrine have proposed such a broad application of it.

[13]Thus, this appeal arrives in a different posture than those in *Bridget R.* and *Crystal R.*, where no "significant contacts" determination had yet been made, and *Alexandria Y.*, where the appellate court was able to determine that neither the mother nor the child had any relationship at all with the mother's tribe.

removed from their present homes and placed in an Indian environment.[14] But these decisions must be made in compliance with the ICWA. It provides, among other things, that "[n]o termination of parental rights may be ordered . . . in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." (25 U.S.C.A. § 1912(f).) If parental rights are terminated and the children placed for adoption, the Act's placement preferences must be followed in the absence of "good cause." (25 U.S.C.A. § 1915(a).) And all interested parties, including the Gila River Indian Community, must be given the opportunity to appear and be heard at the proceedings leading to these determinations.[15] (25 U.S.C.A. § 1912.)

## DISPOSITION

The judgment is reversed.

Stone (W. A.), Acting P. J., and Dibiaso, J., concurred.

---

[14]Alicia and her half-sibling Nathaniel have lived with their maternal great aunt since shortly after they were removed from their parents' custody in 1994. Henry, Jr., and Andrew have lived since 1995 with their current foster caretakers, a non-Indian couple who wish to adopt them.

[15]Our conclusion that the court erred by applying the existing Indian family doctrine renders moot the issue whether the Gila River Indian Community received proper notice of the section 366.26 hearing.