Filed 11/20/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re AUTUMN K., a Person Coming Under the Juvenile Court Law. | |
| DEL NORTE COUNTY DEPARTMENT OF HEALTH & SOCIAL SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>PATRICIA M.,<br><br>    Defendant and Appellant. | A136586<br><br>(Del Norte County Super. Ct. No. JVSQ11-6026) |

This appeal challenges an order terminating the parental rights of mother Patricia M. and father Bryan K. to their daughter Autumn K. and placing the child for adoption. Because Autumn was of Chickasaw descent and thus an Indian child, the dependency proceeding fell within the provisions of the Indian Child Welfare Act, 25 U.S.C. section 1901, et seq. (ICWA). As such, there were particular substantive requirements with which the juvenile court was obligated to comply when selecting a permanent plan for Autumn. Most significantly, absent good cause to deviate from this requirement, ICWA obligated the court to place Autumn with a member of her extended family, a member of her tribe, or another Indian family. (25 U.S.C. § 1915.) Here, there were two potentially viable, ICWA-compliant placements: maternal grandmother Teresa, who had custody of Autumn's six siblings and had sought placement of Autumn from the outset of the dependency case, and maternal aunt Beatrice. Despite that, the court, relying on a conclusion by respondent Del Norte County Health and Social Services

Department (Department) that Autumn could not be placed in her grandparents' home, placed Autumn in a non-Indian home with a distant relative.

On appeal, the parents contend the juvenile court erred for a multitude of reasons. We agree with one argument that necessitates reversal: the Department erred in determining maternal grandfather José had a nonexemptible criminal conviction such that Autumn could not be placed with her grandparents. We conclude two different statutory provisions instructed that the conviction was in fact exemptible, and the Department was thus obligated to evaluate the request for an exemption on its merits. We therefore reverse.

## I. BACKGROUND[1]

### Autumn's Birth and the Indian Custodian Designation Forms

Autumn was born on February 23, 2011, in Crescent City. She was the seventh child born to Patricia and the only one fathered by Bryan. Due to Patricia's long history of substance abuse, her six other children lived with her mother, Teresa, under legal guardianships through the probate department. According to Patricia, before Autumn's birth and again immediately after, she executed an Indian custodian form designating Teresa as Autumn's Indian custodian. The form was entitled "Reighini Rancheria/Social Service Designation of Indian Custodian (25 U.S.C. § 1901, et seq.)." As provided in the form, Patricia transferred the care and custody of her daughter to Teresa, designating her as Autumn's Indian custodian. Teresa also signed the forms, accepting the designation. According to Patricia, Bryan was present both times the form was signed.

---

[1] Many of the background facts are well known to this Court, as we previously considered—and denied—petitions by Patricia and Bryan for a writ of mandate after the juvenile court terminated reunification services to both parents. (*Patricia M. v. Superior Court* (May 25, 2012) A134777 [nonpub. opn.].) We set forth only those facts that are relevant to the issues now before us, which facts we derive from the record filed in this appeal as well as that filed in the prior writ proceeding. On our own motion, we take judicial notice of the record in *Patricia M. v. Superior Court, supra,* A134777. (Evid. Code § 452, subd. (d).)

2

**Autumn's Initial Removal From Her Parents' Care**

Although Patricia tested positive for amphetamines and methamphetamines on multiple occasions during her pregnancy, both she and Autumn tested negative for drugs at the time of Autumn's birth. Nevertheless, a social worker from the Department appeared at the hospital and removed Autumn from Patricia's and Bryan's care, placing her in protective custody. According to both Patricia and Teresa, they attempted to give the Indian custodian forms to the social worker to prevent Autumn's removal, but the social worker would not take them.

Five days after Autumn's birth, the Department filed a Welfare and Institution Code section 300[2] petition alleging that the infant came within the juvenile court's jurisdiction pursuant to subdivisions (b) and (j) due to her parents' substance abuse problems. Shortly thereafter, Patricia signed a parental notification of Indian status, representing that she was a member of the Chickasaw Nation. Notice of the dependency proceeding was sent to the Chickasaw Nation as required by ICWA.[3]

**Autumn's Return to Patricia's and Bryan's Care**

At a detention hearing a week after Autumn's removal, the court ordered her returned to her parents' care on the conditions they reside in the home of Teresa and José and abstain from drug use. The family was provided family maintenance services.

**Detention and Jurisdiction**

On April 22, 2011, the Department filed a section 387 petition alleging that both parents had recently tested positive for drugs. A detention report filed the same day recommended Autumn be detained. At a detention hearing, the court adopted the Department's recommendation, and Autumn was placed in foster care. At the hearing, Teresa addressed the court, asking why Autumn could not remain in her home. The transcript of the hearing is not in the record, and the minutes of the hearing do not reflect the court's answer. It is suggested elsewhere, however, the court was concerned about

---

[2] All undesignated statutory references are to the Welfare and Institutions Code.

[3] Autumn subsequently enrolled as a member of the Chickasaw Nation. There is no dispute that ICWA governed this dependency proceeding.

3

Teresa's ability to adequately care for her newborn granddaughter given that she was already caring for Patricia's six other children, as well as her own adult son who was suffering from Leukemia.

At a jurisdictional hearing the following week, the parents pleaded no contest to the allegations in the supplemental petition, and the matter was continued for disposition. The possibility of overnight visitation with Teresa was discussed, but the social worker believed it was too early, and the court agreed.

At some point subsequent to the jurisdictional hearing, Teresa submitted an application for placement of Autumn. The Department denied it by letter dated May 25, 2011. The reason for the rejection was given as follows: "The Department does not feel that you have the ability and capacity to provide the care and supervision to meet the child's needs at this time."

### Disposition and Family Reunification Services

A contested dispositional hearing was held on June 17, 2011. At the hearing, Teresa submitted multiple letters attesting to the skill and compassion with which she cared for her grandchildren. In one, the Del Norte High School assistant principal described how involved Teresa had been in the schooling of her other grandchildren, attending important academic meetings concerning the children, making sure they were involved in local sports, and responding to discipline issues. In another, the Crescent Elk Middle School dean of students represented that Teresa had "advocated strongly for her grand-children, exhibiting a professional and open-minded approach to issues and discussions regarding their education. She genuinely has their best interest in mind at all times, and places them at the forefront of her life." According to the dean, "She stands up for them when necessary, and holds them accountable as well." He described what a "positive influence" Teresa had been on her grandchildren and represented that she provided them "with a safe, comfortable, and positive household environment." The Joe Hamilton Elementary School principal described how whenever one of the younger grandchildren, who was a special education student, had a bad day, Teresa would quickly respond to calls from the school and calmly speak to her grandson about the issues he

4

was having.  She was, according to the principal, "able to reason with him in a supportive way that often gets him back on track and ready to return to the classroom."

Included in the packet of letters was one from Teresa herself, responding to the May 25 letter rejecting her request for placement.  According to Teresa, she had been told the denial was based on an incident that happened in 2006.  She advised the Department: "That incident was cleared up and I was not found at fault.  Most of my grandchildren have mental health needs and as a concerned grandparent I took it upon myself to take a class from Del Norte County Child Care Council: The Incredible Years.  I completed and received a certificate for 24 hours of participation, this class lasted two weeks.  This class gave me a better understanding of ADHD issues and concerns."  She asked the Department consider the goal of ICWA to " 'protect the best interest of Indian children and to promote the stability and security of Indian Tribes and families.' "  In closing, she noted that her son had cancer and, although she had been taking care of him, he was in remission, which would allow her to spend more time with her grandchildren.[4]

At the hearing, a representative of the Chickasaw Nation advised that the tribe was recommending placement with Teresa.  The Department represented that it supported any placement recommendation by the tribe.  Despite this, the court voiced concerns regarding placement with Teresa, ultimately ordering that Autumn was to remain in her foster care placement while the Department provided family reunification services to both parents.  The matter was continued for a six month review.

**Autumn's Placement With Amanda and Caleb C.**

In September 2011, Patricia developed concerns about the foster home in which Autumn had been living since her April detention.  She asked the Department to place Autumn with Amanda C. and Caleb C. (collectively, the C.'s), who were licensed foster parents.  Caleb was Patricia's former parole agent, and Amanda was her second cousin, making Amanda and Autumn second cousins once removed.  Autumn was placed with them on October 15, 2011.

---

[4] Tragically, Teresa's son passed away three months later.

**The Chickasaw Nation Intervenes**

On November 28, 2011, the Chickasaw Nation, by Indian Child Welfare social worker Regena Frye, moved to intervene in the case, which motion the juvenile court granted on December 9, 2011.

**Six Month Status Review**

Meanwhile, on December 7, 2011, the Department filed a six month status report, advising that both parents were homeless, were still actively using drugs, and had made little to no progress on their case plans, having failed to stay clean despite multiple attempts at rehabilitation. In light of the parents' failed efforts to achieve and maintain sobriety, the Department considered it unlikely Autumn would be able to reunify with them within 12 months from detention. It therefore recommended termination of reunification services for both parents. The Department represented that the current foster parents—the C.'s—were extended family members of Patricia, although the nature of the relationship was not specified. The Department also noted that Patricia's sister in Oregon (later identified as Beatrice) had contacted the Department regarding placement but subsequently declined to move forward with the placement application.

On December 13, 2011, Teresa submitted yet another request for placement, addressing claims that her home was not fit for Autumn to live in. In terms of space concerns, she advised that each grandchild had a bed and space for his or her personal items. The same would be the case for Autumn. According to Teresa, "She would be with her brothers and sister. She would be part of the family on a daily basis. She would be able to grow up among her family. I have recently lost a son and my time is open to care for Autumn without other outside appointments. I am very capable of caring for my granddaughter and want to keep the children together."

Teresa described how she would maintain Autumn's connection to the Indian community: "My family is part of this Indian community and my grandchildren participate in local Native community events and activities throughout the school year and summer. Even though we are not from here, we are part of this Native community and my grandchildren are able to experience and learn local culture, language,

6

tradition[]s. Autumn, being in my home, would allow her to participate, experience and learn her Native heritage from her family and community. If Autumn continues to be placed out of our home, it is not guaranteed that she will have these experiences as a Native person. ICWA law [was] created to prevent this from happening. To[o] many Native children are taken away from their family, culture and Native teaching and I ask that I be given a chance to raise my granddaughter with her brothers and sister and among the Native community."

Teresa also detailed the school and extracurricular schedules of her six other grandchildren, demonstrating that, given their schedules, she and Autumn would have four hours to themselves each morning. She acknowledged the concern that her husband José had "several DUI's," but represented she was the sole transporter of her grandchildren, and would be for Autumn as well. She also identified three individuals who were available to help should she need assistance in transporting the children to their numerous activities.

On December 20, 2011—two weeks after the Department recommended termination of reunification services—Frye submitted a report on behalf of the Chickasaw Nation. She advised that in a December 2 conversation with Department social worker Bob Beck, Beck had represented that despite a recent relapse by Patricia, the Department would continue to offer reunification services, a representation he then contradicted in the December 7 status report. Frye further advised that the Chickasaw Nation was recommending continued reunification services "in an 'Active Effort' to prevent the breakup of the Indian Family." She also requested the Department consider placing Autumn with her grandmother and half-siblings.

On December 29, 2011, Teresa filed a de facto parent request. In addition to detailing the amount of time she spent with Autumn and the activities she did with her, Teresa once again requested placement of Autumn so she could be with her family.

The matter came on for a six month review on January 6, 2011. At the hearing, Frye, who appeared telephonically, represented that the tribe wanted Autumn placed with Teresa under a legal guardianship. The Department, however, recommended Autumn

7

remain in her current foster placement, as she was doing well there and the placement was ICWA compliant because the foster mother was a "member of the family." The six month review hearing was continued for a contested hearing, and the court ordered Teresa be given a minimum of four hours a week visitation with Autumn.

On January 31, 2012, the Department filed an addendum report, this time recommending the continuation of reunification services to both parents until they had received "a year's worth of reunification services from the time of detention. . . ." The Department also advised it had assigned a new social worker so Patricia could focus on reunification rather than her feelings of conflict with the prior social worker. It recommended Teresa be given eight hours a month visitation instead of four hours per week because it felt four hours a week was "a bit much."

On February 10, 2012, the court granted a request by the foster parents to be designated de facto parents. It also denied Teresa's de facto parent petition and reduced her visitation to eight hours per month.

Prior to the contested review hearing, Teresa filed an amended de facto parent status request. In a supporting letter, she pleaded with the court: "When Autumn was taken from Patricia, it was not anything I was doing wrong. You said in court that because my younger son was dying from Leukemia you felt it was better to remove her. My son is gone and I now have time and space for Autumn. I feel I am being punished because of personal issues beyond my control. I would also like to restate that I have many support services and friends that are more than willing to help me transport the children to activities and appointments and school functions as needed. [¶] I am a devoted grandmother to my grandchildren and only want the best for them. I was raised, with the knowledge that the children should be kept together. We are taught to make do with what you have and provide and love all the children equally. I understand that the foster parents love Autumn too, but Autumn is my blood family and she should be with me and her brothers and sisters." Teresa urged the court to give Autumn's siblings "the opportunity to grow up with their younger sister. They miss her terribly . . . . I feel that this separation is breaking the bond the children need. [¶] I ask you to please consider the

8

ICWA law, that stresses keeping the children together. Too many times in the past Native children have been taken away from family and adopted into non-Native homes. They loose their family identity, they loose their connection to their Native Heritage, culture and traditions. Our family is part of this Native community and would like Autumn to have the chance to experience her Native culture with her family[.]" In support, Teresa appended letters from longtime friends and an employee of the Del Norte Indian Education Center in Crescent City, all of whom attested to her dedication to her grandchildren and her commitment to their upbringing.

Although it is unclear from the record how this came about, around that same time, the Department apparently determined that José had a criminal conviction that precluded placement. A request for an exemption of that conviction was made, which the Department denied on February 15, 2012.

### Termination of Reunification Services

On February 21, 2012, the matter came on for a contested review hearing. Counsel for Autumn contested the Department's new recommendation to continue reunification services, and the court took evidence on the matter. At the conclusion of the hearing, counsel for the Department advised it was now of the opinion that active efforts had been made to reunify the family, and it was no longer recommending additional reunification services.

After closing arguments, the court found by clear and convincing evidence that active efforts had been made to reunify the family but neither Patricia nor Brian had taken advantage of the many services provided. With that, the court terminated reunification services to both parents, and set the matter for a section 366.26 selection and implementation hearing on June 15, 2012. Autumn was maintained in her foster placement.

### Patricia and Bryan Unsuccessfully Petition for Extraordinary Writ

On March 14, 2012, Bryan filed a petition for extraordinary writ, arguing that the juvenile court erred in finding the Department made "active efforts" to reunify the family. Patricia's followed a week later, replicating Bryan's petition word for word, save for the

9

addition of Frye's December 20, 2011 report as Exhibit A. We ordered the matters consolidated for all purposes, and by order dated May 25, 2012, we denied both writ petitions, affirming the juvenile court's finding that the Department made active efforts to reunify the parents with Autumn. (*Patricia M. v. Superior Court, supra,* A134777.)

### Patricia Requests Reinstatement of Reunification Services

Meanwhile, on May 15, 2012, while the writ petitions were pending before us, Patricia filed a section 388 request, seeking reinstatement of reunification services on the grounds that she was participating in a treatment program and had been testing clean.

### The Department Recommends Termination of Parental Rights and Adoption by the C.'s

On June 6, 2012, the Department filed a section 366.26 report recommending the court terminate the parental rights of Patricia and Bryan and select and implement a permanent plan of adoption. The Department advised that the parents continued to have problems. After services were terminated, Patricia made another effort at rehab. She relapsed again, however, proving to the Department she was unable to remain clean and sober. Bryan was incarcerated due to a domestic violence incident between him and Patricia. It summarized: "Both parents were offered services to reunify with their daughter for approximately 10 months. However, the active efforts by the Department were unsuccessful, as found by the Court in February in 2012 and confirmed by the Court of Appeal in June of 2012. It is also apparent that circumstances haven't improved for the parents, and there is not a substantial probably [*sic*] that Autumn could be returned, if services were to be offered again. Therefore, the Department is recommending that the parental rights of the parents be terminated."

In terms of a permanent plan, the Department recommended adoption by the C.'s: "Autumn is a 15 month old little girl who has spent the majority of her life bouncing back and forth from visits to her foster homes. Autumn is now in a loving, relative, two parent family home that is extremely dedicated to meeting her needs. The C.'s can offer Autumn a safe, stable, and secure parenting relationship, love, unconditional commitment, and lifelong support in a legal adoption. They can also offer her an

10

opportunity to know her culture and her family. Autumn deserves permanency and normalcy in her life and the Department strongly believes the selection of the permanent plan of adoption with the C.'s would be in Autumn's best interest."

The Department represented that Amanda's mother and Teresa were first cousins, making Amanda and Autumn second cousins once removed. As such, the Department claimed, the home met ICWA placement requirements. Further, while Amanda was non-Indian, she grew up in an Indian household because her adoptive father was a Yurok tribal member. She had a "great" relationship with him, and he would assist in teaching Autumn about her Native American heritage.

The Department noted that Teresa had requested placement of Autumn, but the request was denied through the licensing process, identifying José's criminal history as the reason Autumn could not be placed in their home. According to the Department, it was clear Teresa loved Autumn, and the C.'s were hopeful that once the dependency proceeding concluded, Teresa could settle into her role as a grandmother to Autumn and move past her feelings of anger and disappointment so they could have a respectable working relationship for the sake of all of Teresa's grandchildren.

In an adoption assessment appended to the section 366.26 report, adoption specialist Teddee-Ann Boylan recommended Autumn be adopted by the C.'s. According to the assessment, Autumn had a "secure and nurturing relationship with her potential adoptive family" and had "substantial emotional ties" to them. Removal from their care, Boylan opined, would be detrimental to Autumn's well being, and she would benefit from the establishment of a permanent parent/child relationship with them.

Boylan also advised that the Chickasaw Nation's first choice for Autumn's placement was in Teresa's home with her grandparents and half-siblings, if the grandfather's nonexemptible criminal history could be expunged. Barring that, the tribe had initially agreed with placement with the C.'s, but then changed its recommendation, seeking placement of Autumn with maternal aunt Beatrice who lived in Oregon. The tribe believed this placement would be better for Autumn because it would ensure regular

11

contact between Autumn and Teresa, contact that might not happen under adoption by the C.'s because Amanda and Teresa had "challenges in their relationship."

Boylan also advised that Patricia claimed to have signed Indian custodial papers at the hospital that were not considered when Autumn was taken into emergency custody. Patricia worried about post-adoption contact with Autumn because she and Amanda did not get along. According to Boylan, Patricia also questioned why ICWA placement preferences were not being followed.

Boylan also described a meeting with Teresa regarding Autumn's placement. At the meeting, Teresa expressed a "great deal of grief" at the inability to have Autumn placed in her home. Teresa referred her to Rich England, whom the tribe and Teresa had retained as their ICWA expert. Boylan contacted England, who advised that Teresa was very dedicated and had demonstrated the ability to be a good advocate for her grandchildren. They were all well bonded and involved in the local Native American community. He voiced concern that Autumn would not have a connection to her culture should she be adopted by the C.'s, and he remained hopeful she would be placed with her grandparents and half-siblings if the grandfather's criminal history were expunged.

Boylan noted that the C.'s had been advised they could enter into a written agreement concerning post adoption contact between Autumn and her birth family. While they were amenable to maintaining contact with Autumn's siblings, they did not believe contact with other family members would be suitable due to "on-going issues" stemming from their grief and anger about Autumn not being placed with them.

### The Tribe's ICWA Expert Recommends Placement of Autumn With Teresa or Beatrice

On June 13, 2012, ICWA expert England submitted a report in which he opined that the Department's adoption recommendation was not in Autumn's best interest as required by ICWA. As he explained it: "When an Indian child is removed from the home and adoption or guardianship is in question the child should be placed with extended Indian family within the family of the child's tribal affiliation. The prospective family is not an Indian family according to the government's federal recognition of tribal

12

members. The home is not a Tribal Family Home or family member within the child's tribal affiliation. They are non Native family members that should have only been looked upon had there been no other alternatives within the immediate Indian family. . . . [T]he fact of the matter is that the maternal Aunt, Beatrice R., who is a Chickasaw tribal member and considered a preferred placement within the immediate Indian family, was never considered as a placement by the [Department] or actively pursued as a possible placement. Yet a second cousin three [*sic*] times removed to Autumn, with strained relations with the family, and who was actively looking for an adoptable child was chosen."

Further supporting his position that placement with the C.'s was not in Autumn's best interest, England noted that there would be no tribal member living in the home to teach Autumn about her Chickasaw culture. Amanda's stepfather was a Yurok tribe member, but he did not live in the C.'s home, was not a blood relative to either Amanda or Autumn, and was not Chickasaw. As a result, it was a "Non Indian Family Home," and placement there would not protect the sovereignty and culture of Autumn or her tribe, especially given that the Department failed to investigate other "culturally appropriate immediate family resources available for placements for Autumn . . . ."

England was also of the opinion that termination of parental rights would be detrimental to Autumn. He acknowledged that neither Patricia nor Brian was a "viable resource[]" for her, but recommended that she be placed in Teresa's home under a guardianship, where she would be reunified with her Chickasaw siblings and grandmother "and the rest of her 'Immediate Indian Family.'" He also represented that the Chickasaw Nation was in agreement, provided the grandfather's criminal history was expunged.

Referring to Teresa, England described her as follows: "[S]he is a very active, well known, and integral part of the Indian Community here in Del Norte County. Teresa is typical of many Indian Grandmothers with tradition and culture in that she is raising her grandchildren and teaching them their Chickasaw Culture while exposing them to local tribes. Teresa is an accepted Indian Person in our Community and her

grandchildren participate in and are accepted by the Indian Community as Chickasaw Tribal Members. Teresa's grand children participate in all things for Native Youth which includes boat making, cultural presentations, crafts, and all other things provided to tribal members. Teresa is well known with her involvement in the schools and looked upon as someone that participates in everything that her grandchildren are involved with. This includes chaperoning field trips, going to IEPs, visiting teachers and staff, and being an exceptional advocate for all of her grandchildren's well being. Teresa is also very well liked by the school staff and a very strong advocate in her grandchildren's education and extra curricular activities. Teresa can often be seen driving her grandchildren to and from their practices and making sure that they have the same opportunities as everyone else. Throughout this process, and with the loss [of] her granddaughter, Teresa has shown determination and dedication by continuing to work toward bringing Autumn home to her Chickasaw family."

Keith Taylor, the Department's ICWA expert, also submitted a report, first setting forth his experience and outlining the procedural background of the case. Then, in the one substantive paragraph, he conclusorily stated that he supported Autumn "remaining with the current care provider and being adopted because the child has lived half his [*sic*] life with the current foster parents. The placement with the current Substitute Care provider is in compliance with the parameters of the Indian Child Welfare Act (The foster mother is a cousin to the child-at-issue) and wishes to adopt the child-at-issue."

**Hearing On the Section 388 Petition, Teresa's De Facto Parent Request, and the Selection and Implementation Plan**

On June 25, 2012, three matters came on for hearing: (1) Patricia's section 388 petition; (2) Teresa's amended de facto parent request; and (3) the section 366.26 selection and implementation plan. Patricia, Bryan, Teresa, and the C.'s were all present and represented by counsel, and counsel for Autumn was present as well. ICWA expert England appeared on behalf of the tribe.

Patricia's section 388 petition was heard first. Her attorney began by acknowledging "quite honestly" that she had "a weak case in terms of the request that she

14

continue to receive services." The court asked for an offer of proof as to the change in circumstances justifying additional services. Counsel responded by outlining the "several months of diligent and sincere efforts of [Patricia] to change her ways . . ." He admitted "it's true that when called to testify she will say that she relapsed within, what, two months," but he suggested the burden was on the Department to demonstrate that the changed circumstances did not rise to the level necessary to justify a changed order. He also suggested the services previously provided by the Department had been inadequate because of the friction between Patricia and the original social worker. After argument by other counsel, the court denied Patricia's motion, citing our prior opinion that the Department made active efforts at reunification but that Patricia's attempts at rehabilitation remained unsuccessful.

The court then turned to Teresa's de facto parent request which, according to the reporter's transcript, it granted. Although the propriety of that order is not before us, much of the testimony also relates to the issues on appeal, and we discuss it accordingly.

Teresa testified that Patricia came to live with her for the last two months of her pregnancy. Shortly after Autumn was born, someone from the Department appeared at the hospital and took custody of her. A week later, she was returned to Patricia's and Bryan's care on the condition they lived in Teresa's and José's home. During the time Autumn was in her home, Teresa and Patricia took joint care of her, and Autumn's six half-siblings also interacted with her. After approximately two months, Teresa reported to the Department that she suspected Patricia and Bryan were using drugs again. After an investigation, the Department took custody of Autumn. The court did not place Autumn with her at that time because her 21-year-old son was extremely ill and she "had a lot on [her] plate," including frequent trips to San Francisco for medical treatments. Consequently, Autumn was placed in a foster home, and later moved to the C.'s.

At the time of the hearing, Teresa had guardianships over Patricia's other six children who then ranged in age from five to 17. She had taken care of all of them since birth, except for two who came to her when they were four. All of the children had been excited about Autumn's birth and interacted with her while she lived in the home.

15

Teresa visited with Autumn eight hours per month. She would bring many of Autumn's siblings with her and they would play together. Although Autumn recognized her grandfather, she had little interaction with him because he was usually at work during visits.

Teresa testified that at the time of Autumn's birth, she signed an Indian custodian designation form, consenting to be Autumn's Indian custodian. When Autumn was removed from Patricia's care the second time, Teresa did not give the forms to the Department because Patricia had placed them in her trailer and Teresa did not know where they were.

After all evidence was presented on the de facto parent request, the court indicated it did not think Teresa met the requirements to be granted de facto parent status. Acknowledging, however, that she had been very involved and important in the dependency proceeding, it expressed its intent to grant de facto parent status so she could participate in future proceedings. The court then turned to the permanency hearing.

Evidence was taken over the course of three days, with Keith Taylor, the Department's ICWA expert, the first to testify. Describing this as "a difficult case," "a struggle," Taylor was of the opinion the C.'s should be permitted to adopt Autumn. He believed adoption was an appropriate long-term placement plan, while guardianship would not provide sufficient permanency since it could be "unwound" in the future. Because Amanda was related to Autumn, Taylor believed the adoption would satisfy the ICWA placement preferences. He felt it important that Autumn have continuing contact with her siblings, and his recommendation that the C.'s adopt her was predicated on his trust that the C.'s would maintain post adoption visitation between the siblings.

Taylor also believed Amanda was very committed to maintaining Autumn's cultural ties with the Chickasaw Nation. He noted she was adopted and raised by an Indian man herself, and she understood the importance of maintaining Autumn's connection to her culture. He acknowledged, however, he did not ask Amanda about her involvement with the Chickasaw culture, explaining he envisioned the Chickasaw contact coming through Teresa and Autumn's siblings. He also expected Amanda to make an

16

effort to connect Autumn to local tribal activities, although he was not aware of anything she was doing to connect Autumn to her heritage. Taylor felt a non-Indian family could set appropriate standards for an Indian child.

On cross-examination, Taylor reiterated this was a very close case and the balance just tipped in favor the C.'s. He was aware the tribe wanted Autumn to be with Teresa, but he felt Autumn's best interests were in adoption by the C.'s. He was also concerned about the grandfather's criminal convictions, and he considered it relevant that Amanda was a bank manager and Caleb was a law enforcement officer. He was aware Autumn had an aunt but he had not contacted her because he did not have her telephone number.

When asked about compliance with the goal of preventing the breakup of the Indian family, Taylor testified that adoption by the C.'s satisfied that goal because Amanda was a distant relative. When asked how distant a relative had to be before he or she ceased to have an active identity as part of the Indian family, Taylor responded, "There's some tribes that have direct descendants as tribal members. It really is—you know, we have people that identify as Native that couldn't come up with a federal I.D. card . . . and we accept that. That's not something that . . . we challenge. [¶] People identify as being Indian or Native, we just accept it. It doesn't matter what their blood quantum is."

England was the next to testify. In his opinion, in the interest of keeping Autumn within her culture, the Department was obligated to consider first her immediate family, here Teresa. He acknowledged the Department had deemed her home unsuitable, but because the grandfather's criminal record had been expunged,[5] it was arguably now an acceptable placement. Barring placement with Teresa, the Department should have considered alternate family members, in this case Beatrice, but it overlooked her as an option. Instead, the Department was recommending adoption by a "good family," but one that had no cultural connection to the Indian community. And he considered

---

[5] This presumably happened between June 13, when England submitted his report, and the June 25 permanency hearing.

Autumn's isolation from her tribal roots harmful to her. As he put it: "[T]he dichotomy that we have seen in the courtroom is that you have a good family who would give this girl what she needs financially and emotionally. And I don't argue those things. [¶] But as far as the Indian Child Welfare Act is concerned, that's not what it's about. It's about protecting culture. [¶] And because this child is an enrolled member of the Chickasaw tribe, that tribe's best interests are being represented right here, and if they lose this child to a non-Indian family who is loosely related to a Yurok person who just so happens to be a distant cousin of mine, that's not—it's not the same. It's not the same as being raised within your own immediate family." According to England, the Department was duty-bound to provide for Autumn's best interests in accordance with ICWA. This, he opined, it had not done since it was advocating adoption by a non-Indian family. England had considered the effect of displacing Autumn from her home with the C.'s, but "attachment bonding does not supersede the Indian Child Welfare Act."

On the other hand, England described Teresa as a known part of the Indian community: "I've seen her in the Indian community. I've watched her at different community events. [¶] She's very embedded in the Indian community. She knows a lot of our Yurok and Karok and Tolowa folks. She's an Indian person within our Indian community, and she's recognized as such, and that comes with being a participant, taking your kids to cultural events and enmeshing them in the culture and the quality that we have as Indian people here in our community. [ ¶] The Indian community is a combination of the tribes. It's not just Yurok, it's not just Tolowa. It's a combination of the tribes. [¶] We all intermix, and people know each other. Even if they are not an Indian from this community, people know her and her children as Indians." He could not say the same for the C.'s, whom he had never seen at Indian cultural events: "[T]he C.'s are upstanding members by all accounts, but they are not Indian."

England also testified that Teresa was very involved in her grandchildren's educational experience, often helping and checking in at school and assisting with extracurricular activities: "I've watched her over the last ten years, and she does a great job. She has a lot of grandkids that she takes care of and she provides care for."

18

Heather Friedrich, who had been the social worker on the case since January 2012, followed. She testified that Autumn could not be placed in Teresa's home because even though José's criminal history had been expunged, his prior convictions still precluded placement. This was according to Friedrich's supervisor who was relying on a manual that indicated an expungement still did not allow placement. When asked if Teresa's home would be a suitable placement but for the José's criminal history, Friedrich responded, "At this time, we wouldn't recommend it because we do not believe it would be in her best interests, because—as far as suitability of the home, I believe the home was appropriate if you take out the criminal background."

When asked about what the C.'s had done to introduce Autumn to Indian activities, Friedrich answered, "I have given them the enrollment packet for Autumn to be enrolled in the Chickasaw, and with that came some flash cards with some Chickasaw Indian words on them. And I know I've spoken with Ms. C. and she said she showed those to Autumn. [¶] There was also some coloring pages there, and she said Autumn drew on the color pages. So given Autumn's age and what she can do, I think Ms. C. has respected that."

At this point in the hearing, the court broke for lunch. After the break and out of the presence of witnesses, the Department provided the court with a document entitled, "Evaluator Manual Background Check Procedures."[6] The court read into the record the following passage from the manual:

"The amount of exemption cannot be based on the criminal conviction that has been pardoned. Such a denial is not authorized by statute, and prohibited by law.

"Any doubt about the status of the conviction, call legal—however, convictions have been set aside or dismissed due to 1203.4 or 4(a) of the Penal Code are still considered convictions for exemption process and purposes pursuant to these Penal Code sections, and the Health and Safety Code.

---

[6] The manual was not admitted into evidence and is thus not part of the record before us.

19

"When the court sets aside or dismisses a conviction based on the Penal Code section, it means, for example, that the convicted subject has satisfactorily fulfilled probation and has applied to the court to set aside and dismiss the plea, it does not mean the subject was never convicted of a crime.

"After review of the criminal record transcript, the Department may grant an exception from disqualification for license, employment, or presence in the home pursuant to Section 89219."

Thereafter followed lengthy debate about the significance of the manual and whether it applied to a home being evaluated for a guardianship, and what impact the expungement had on José's conviction.

Counsel for Teresa represented that José had convictions for violations of Penal Code section 272 (contributing to the delinquency of a minor), Health and Safety Code section 11352 (transporting or selling a controlled substance), and Vehicle Code section 23152 (driving under the influence). He then argued that the regulations set forth in the manual did not apply to guardianships, and if they did an exemption should have been granted. He contended that with the expungement, Teresa's home should now qualify for placement.

Counsel for the C.'s noted that according to the manual, Penal Code section 272 for contributing to the delinquency of a minor was listed as one of the nonexemptible crimes. Supervising social worker Julie Cain agreed: "A foster home or a relative or a nonrelated extended family member who is approved through the Department is certified as a licensed home. [¶] The background is the same, so as long as this child is a dependent of the court, under the court's jurisdiction and placed with the Department for placement, we cannot place in [Teresa's] home. [¶] That is a nonexemptable [*sic*] crime under background. Doesn't matter if it was a tribally-approved home, the background is the same. We cannot place there."

Teresa's attorney responded that the manual was simply a departmental policy that did "not have the effect of a force of rule of law." Counsel for the Department countered

that the manual was a state regulation adopted by the State Department of Social Services and it controlled all placements by the Department.

After further argument, the court stated, "Well, in any event, we still have some major outstanding issues here. And based upon what we've just been handed here concerning Department of Social Services rules and what they are operating under, we certainly can't proceed having in mind that the outcome of this matter might be placement with grandma. [¶] And so I'd like to give everyone an opportunity. Mr. Davies [counsel for Teresa], if you want to research and brief that and present your position on that, and perhaps then the Department could also get some authority to back up your interpretation of the reading of this matter, and those are—that's the rules that you work with, and those are set forth in the—in the Department of Social Services manual."[7]

Social worker Friedrich then returned to the stand. She testified that in December 2011, the Department did reach out to Beatrice to ask if she was a placement option, but she declined. She subsequently approached the Department in April 2012 about placement, but an interstate assessment would have taken months, and the Department decided not to pursue it because it did not believe there was a reason to remove Autumn from her current placement. When asked why she did not originally pursue placement but now wanted custody, Beatrice explained that she previously believed Patricia was going to get Autumn back.

Friedrich also testified that a couple of weeks prior to the hearing, Teresa advised her that Patricia had signed Indian custodian designation forms, but Friedrich was never given a copy of the form and did not know when it had been presented.

Adoption specialist Boylan testified that she had interviewed Teresa and José regarding their request for placement of Autumn, but she was aware José had a nonexemptible criminal conviction. Boylan also confirmed that Beatrice submitted a placement request in April 2012. She spoke with her on June 1, inquiring why she was

---

[7] There is no indication in the record this briefing ever took place.

21

coming forward at such a late date. Beatrice responded that she had previously believed Teresa would be taking custody of Autumn, and she came forward when she learned that José's criminal history would preclude that placement.

Boylan testified that she had also met with the C.'s, who had been interested in an adoption since May 2010. In her adoption assessment, Boylan had recommended them as the adoptive parents for Autumn She had observed Autumn with the C.'s and found her to be very comfortable and stable in the home. The C.'s were her psychological parents, and she appeared very well adjusted, happy, and loved. According to Boylan, the Department first considered current caretakers, and since Autumn was stable and doing well with them and they did not want to disrupt her, it did not consider other placements. She believed the placement was ICWA-compliant because the statute specified a family member as the first preference, not requiring that it be a Native family.

According to Boylan, the Chickasaw Nation initially agreed with the adoptive placement with the C.'s. In May 2012, however, the tribe conveyed a preference that Autumn be placed with a closer relative and asked the Department to complete an assessment of Beatrice. Despite this request, Boylan did not change her recommendation because by that point, Autumn had "spent half of her lifetime in the care of the C.'s and ha[d] developed a relationship where she's exhibiting an attachment to them, and I believe that there is a risk of detriment if we try to move her." Boylan testified Autumn had already experienced "quite a bit of loss in her short 16 months of life" due to having been in four different placements. If she were removed from the C.'s home, it "might" compound her prior losses and interfere with her ability to create new attachments.

As to any conflict between the C.'s and Autumn's family, Boylan was hopeful that "things may settle down" when the case was concluded and "people . . . underst[oo]d what the reality is going to be for Autumn in the future . . . ." She had spoken with the C.'s about the possibility of a post adoption contact agreement, and they were not interested, although they expressed an intent to maintain a relationship between Autumn and her siblings as well as her grandparents, provided the relationship improved.

22

Supervising social worker Julie Cain testified that neither Patricia nor Teresa told her Patricia had signed an Indian custodian designation form. She confirmed it would have been a topic of discussion if the form had been presented at the time of detention.

It was Cain's continued recommendation that the court terminate parental rights and order adoption as the long-term placement for Autumn She was unaware of any way Teresa's home could be approved for placement because the state regulations prevented exemption of José's criminal conviction.

Bryan did not testify, but his attorney made an offer of proof that he would testify his preference was for placement of Autumn with Teresa or, alternatively, Beatrice.

Patricia took the stand, testifying first about the Indian custodian designation forms. According to Patricia, she filled out the first form in the presence of Bryan, Teresa, and a woman named Tawny Youngblood. The second form only differed in that she signed it after Autumn was born. She was scared because she had been using drugs throughout her pregnancy and was afraid the baby would be taken away from her.[8] She had used a similar form when she gave birth to one of her sons in prison, authorizing Teresa to pick him up, and she intended the same thing to happen with Autumn. According to Patricia, when the social worker appeared at the hospital after Autumn's birth, Patricia informed her she had signed the designation. The social worker disregarded the form and called law enforcement to remove Autumn because Patricia and Bryan would not give her up. Patricia did not recall providing the form to the Department at any other time.

Patricia testified that after Autumn was removed from her custody, she was placed in a foster home about which she had concerns. One day she ran into Caleb, her former parole officer, and he informed her that he and Amanda had a foster care license. At Patricia's request, Autumn was transferred to their care in what Caleb lead Patricia to believe was a temporary arrangement while she completed her case plan. She only

---

[8] Patricia testified at length about her drug history, her efforts to get clean, and her interactions with social workers Beck and Friedrich. We largely omit these details since they have little bearing on the issues before us.

23

learned they were trying to adopt Autumn a month or two prior to the permanency hearing.

Patricia confirmed she wanted Teresa to have custody of Autumn. Despite her son's recent passing and the fact that one of her other grandchildren had a learning disability, Teresa had the ability to parent Autumn in addition to the other six children.

Teresa also testified, confirming that she and Patricia attempted to give the Indian custodian designation forms to the social worker at the hospital right after Autumn's birth, but the social worker refused to accept them. She did not present them to the Department again after Autumn was removed from Patricia's and Bryan's custody the second time because Patricia had put the forms in her trailer and Teresa did not know where they were.

Like Patricia, Teresa testified that she did not know the C.'s were planning to adopt Autumn. It was her understanding it was a temporary placement. Teresa had filled out paperwork to request placement of Autumn, and she and José had added a room on to their house in anticipation of Autumn being placed with them. Teresa had regularly visited with Autumn since she was detained by the Department.

Teresa detailed what she did to involve her grandchildren in the Indian culture, noting that the children participated in Indian events all year long.

Appearing by telephone, Chickasaw representative Regena Frye testified the Chickasaw Nation did not have a custom allowing for placement with a second cousin once removed, especially if a maternal grandmother was available for placement. According to Frye, ICWA supersedes the consideration of stability in the home and makes the best interest of the child the overall governing concern. And the best interest of the child is to follow the placement preferences of ICWA. She confirmed that the Chickasaw Nation's preferred placement of Autumn was with Teresa.

Frye acknowledged that in her December 14, 2011 report she indicated Autumn, who was then in the care of the C.'s at that time, was in an ICWA-compliant relative placement, but she was unaware that Autumn and Amanda were such distant cousins. She disputed that up until April 2012, the tribe was in agreement with placement with the

24

C.'s, claiming the tribe had only agreed with placement with the C.'s if placement with Teresa was not possible. And, at the time of the hearing, if placement with Teresa was not possible, the tribe wanted Autumn placed with Beatrice.

Amanda, the prospective adoptive mother, was the last to testify. According to Amanda, Autumn was placed in her home on October 15, 2011, with the consent of all parties. Autumn referred to her and her husband as "Mom" and "Daddy," and was emotionally bonded to them. Amanda represented that they were "[a]bsolutely" willing to maintain post adoption contact with Autumn's siblings and other family members. She was also willing to have Autumn participate in Native American activities. Amanda, whose adoptive father was an enrolled member of the Yurok tribe, had three teenage children, two of whom had been involved in Yurok programs. There were also a number of other relatives on Amanda's side who were Native American.

At the conclusion of the third day of testimony, the court took the matter under submission.

**The Court's Written Order**

On September 4, 2012, the court issued its written order on all three matters, first addressing Teresa's request to be designated as a de facto parent. Despite having orally granted the request at the hearing, the court denied it, indicating it had previously denied a de facto parent request by Teresa and she had not presented any new evidence.

As to Patricia's section 388 motion, the court noted it was based on her representation that she had made significant changes in her life and was aggressively pursuing her own program of sober and responsible living, but she had relapsed subsequent to filing the motion. Accordingly, citing the active efforts provided by the Department, as well as Patricia's failure to provide proof of changed circumstances, the court denied her request, reaffirming its previous order terminating services.

Turning last to the issue of permanency, the court remarked that Patricia had seven children, six of whom were subject to a probate guardianship with Teresa. She was never married to any of the multiple fathers, nor was she very active in raising her children, having admittedly been addicted to methamphetamine since she was at least 25 years old.

Bryan had a long record of contact with law enforcement and was incarcerated on a domestic violence charge at the time of the hearing. He was likewise an admitted meth addict and had failed at all rehabilitation efforts. Given the parents' failure to develop the basic ability to successfully parent Autumn, combined with their history of substance abuse and failed rehabilitation efforts, the court found beyond a reasonable doubt that Autumn would suffer serious physical or emotional damage if her parents retained custody of her. It therefore terminated parental rights of both parents.

The court next addressed the permanent plan for Autumn. After outlining the testimony presented at the hearing, the court began with a discussion of 25 U.S.C. section 1915, which provides that "In any adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families." According to the court, the phrase "good cause" has been interpreted to give state courts flexibility in determining the placement of an Indian child, and the child's best interest, which is the primary concern, may override a tribal or family interest. Citing testimony by "a number of involved persons who have experience in such matters . . . express[ing] concern for the psychological impact that Autumn might sustain by being removed from her loving, safe and secure relationship with the [C.] family," the court ordered adoption as the permanent plan.

Timely notices of appeal by both parents followed.

## II. INDIAN CHILD WELFARE ACT

The purposes of ICWA, 25 U.S.C. § 1901 et seq., have been discussed ad nauseum since its 1978 enactment. (See, e.g., *Adoptive Couple v. Baby Girl* (2013) 133 S.Ct. 2552 2557; *Mississippi Band of Choctaw Indians v. Holyfield* (1989) 490 U.S. 30, 32; *Dwayne P. v. Superior Court* (2002) 103 Cal.App.4th 247, 253; *In re Desiree F.* (2000) 83 Cal.App.4th 460, 469; *In re Alexandria Y.* (1996) 45 Cal.App.4th 1483, 1488–1490.) Despite extensive case law and many other writings on the subject, dependency courts and social services departments continue to ignore the dictates of the act, often failing to provide proper notice of a dependency proceeding involving an Indian child (see, e.g., *In*

26

*re A.G.* (2012) 204 Cal.App.4th 1390, 1396–1397) and, in other instances, disregarding the substantive mandates of the law. (See, e.g., *In re Jullian B.* (2000) 82 Cal.App.4th 1337, 1349–1351.) In light of these ongoing failings, we take this opportunity to, once again, articulate the genesis and purposes of ICWA with the hope that the mandates of the act will finally be taken to heart.

ICWA was "the product of rising concern in the mid-1970's over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes." (*Mississippi Choctaw Indian Band v. Holyfield, supra,* 490 U.S. at p. 32; see also *Adoptive Couple v. Baby Girl, supra,* 133 S.Ct. at p. 2557.) As Calvin Isaac, tribal chief of the Mississippi Band of Choctaw Indians, testified before the United States Senate: " 'One of the most serious failings of the present system is that Indian children are removed from the custody of their natural parents by nontribal government authorities who have no basis for intelligently evaluating the cultural and social premises underlying Indian home life and childrearing. Many of the individuals who decide the fate of our children are at best ignorant of our cultural values, and at worst contemptful of the Indian way and convinced that removal, usually to a non-Indian household or institution, can only benefit an Indian child.' " (*Mississippi Band of Choctaw Indians v. Holyfield, supra,* 490 U.S. at pp. 34–35, quoting the hearings on Sen. Bill No. 1214 before the Subcom. on Indian Affairs and Public Lands of the House Com. on Interior and Insular Affairs, 95th Cong., 2d Sess. (1978) at pp. 191–192.)

Chief Isaac's sentiments were echoed in the Congressional findings set forth in the first section of ICWA:

"(3) that there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children and that the United States has a direct interest, as trustee, in protecting Indian children who are members of or are eligible for membership in an Indian tribe;

"(4) that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions;

"(5) that the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families." (25 U.S.C. § 1901.)

In the second section of ICWA, Congress declared it a national policy "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs." (25 U.S.C. § 1902.)

Consistent with this policy, ICWA establishes procedural and substantive standards governing the removal of Indian children from their families. (*In re W.B.* (2012) 55 Cal.4th 30, 40; *In re H.A.* (2002) 103 Cal.App.4th 1206, 1210; *In re Alicia S.* (1998) 65 Cal.App.4th 79, 81.) Our Supreme Court recently described these standards as follows:

"When applicable, ICWA imposes three types of requirements: notice, procedural rules, and enforcement. [Citation.] First, if the court knows or has reason to know that an ' "Indian child" ' is involved in a ' "child custody proceeding," ' as those terms are defined in the Act [citation], the social services agency must send notice to the child's parent, Indian custodian, and tribe by registered mail, with return receipt requested. [Citation.] If the identity or location of the tribe cannot be determined, notice must be sent to the Bureau of Indian Affairs (BIA). [Citation.] No hearing on foster care placement or termination of parental rights may be held until at least 10 days after the tribe or BIA has received notice. [Citation.]

28

"Next, after notice has been given, the child's tribe has 'a right to intervene at any point in the proceeding.' [Citation.] 'At the heart of the ICWA are its provisions concerning jurisdiction over Indian child custody proceedings. . . . [I]n the case of children not domiciled on the reservation: on petition of either parent or the tribe, state-court proceedings for foster care placement or termination of parental rights are to be transferred to the tribal court, except in cases of "good cause," objection by either parent, or declination of jurisdiction by the tribal court.' [Citation.] If the tribal court does not assume jurisdiction, ICWA imposes various procedural and substantive requirements on the state court proceedings. Indigent parents or Indian custodians have the right to court-appointed counsel. [Citation.] Before the court can place an Indian child in foster care or terminate parental rights, it must find 'that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.' [Citation.] A foster care placement also requires a finding, by clear and convincing evidence, based on testimony from 'qualified expert witnesses,' that 'continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child.' [Citation.] Before a termination of parental rights may occur, likelihood of harm must be proven beyond a reasonable doubt. [Citation.] Once the appropriate showing is made, ICWA establishes rules for the placement of an Indian child outside the home. 'The most important substantive requirement imposed on state courts is that of § 1915(a), which, absent "good cause" to the contrary, mandates that adoptive placements be made preferentially with (1) members of the child's extended family, (2) other members of the same tribe, or (3) other Indian families.' [Citation.]

"Finally, an enforcement provision offers recourse if an Indian child has been removed from parental custody in violation of ICWA. Upon a petition from the parent or the child's tribe to 'any court of competent jurisdiction,' a foster care placement or termination of parental rights will be invalidated if the action was conducted in violation of ICWA." (*In re W.B., supra,* 55 Cal.4th at p. 49.)

29

The year following the enactment of ICWA, the BIA enacted guidelines for state courts concerning the implementation of ICWA. (*Guidelines for State Courts; Indian Child Custody Proceedings*, 44 Fed. Reg. No. 228, p. 67584 (Nov. 26, 1979) (BIA Guidelines).) According to the BIA Guidelines, "The Indian Child Welfare Act, the federal regulations implementing the Act, the recommended guidelines and any state statutes, regulations or rules promulgated to implement the Act shall be liberally construed in favor of a result that is consistent with these preferences. Any ambiguities in any of such statutes, regulations, rules or guidelines shall be resolved in favor of the result that is most consistent with these preferences." (*Id.*, p. 67586.)

Despite the dictates of ICWA, as supplemented by the BIA Guidelines, application of ICWA's provisions was often inconsistent and perfunctory in California. (California Judges Benchguide: The Indian Child Welfare Act (2010) p. 7; see also Sen. Judiciary Com. Analysis of Sen. Bill No. 678 (2005–2006 Reg. Sess.), as amended Aug. 22, 2005, p. 6. ["[A]lthough ICWA was enacted more than 25 years ago, state court and county agencies in California continue to violate not only the spirit and intent of ICWA, but also its express provisions."].) As a result, in 2006, the California Legislature adopted Senate Bill 678 (SB 678), which incorporated ICWA's requirements into California statutory law, revising several provisions of the Family, Probate, and Welfare and Institutions Codes. (See Assem. Com. on Judiciary, Analysis of Sen. Bill No. 678 (2005–2006 Reg. Sess.) as amended June 14, 2006; 2006 Stats., Ch. 838, § 1.) According to the Assembly Judiciary Committee, the goal of SB 678 was to ensure compliance with ICWA requirements in order to foster Indian children's connection with their tribal heritage. (*Ibid.*) And per the Senate Rules Committee, the bill "revises and recasts" provisions of state law "by codifying into state law provisions of [ICWA], [BIA] Guidelines for State Courts, and state Rules of Court" and "affirms the state's interest in protecting Indian children and the child's interest in having tribal membership and a connection to the tribal community." (Sen. Rules Com. Analysis of Sen. Bill No. 678 (2005–2006 Reg. Sess.) as amended Aug. 22, 2006, p. 1.)

Among many other provisions, SB 678 added section 224 to the Welfare and Institutions Code, setting forth the following Legislative findings and declarations:

"(a)(1) There is no resource that is more vital to the continued existence and integrity of Indian tribes than their children, and the State of California has an interest in protecting Indian children who are members of, or are eligible for membership in, an Indian tribe. The state is committed to protecting the essential tribal relations and best interest of an Indian child by promoting practices, in accordance with the Indian Child Welfare Act (25 U.S.C. Sec. 1901 et seq.) and other applicable law, designed to prevent the child's involuntary out-of-home placement and, whenever that placement is necessary or ordered, by placing the child, whenever possible, in a placement that reflects the unique values of the child's tribal culture and is best able to assist the child in establishing, developing, and maintaining a political, cultural, and social relationship with the child's tribe and tribal community.

"(2) It is in the interest of an Indian child that the child's membership in the child's Indian tribe and connection to the tribal community be encouraged and protected, regardless of whether the child is in the physical custody of an Indian parent or Indian custodian at the commencement of a child custody proceeding, the parental rights of the child's parents have been terminated, or where the child has resided or been domiciled.

"(b) In all Indian child custody proceedings, as defined in the federal Indian Child Welfare Act the court shall consider all of the findings contained in subdivision (a), strive to promote the stability and security of Indian tribes and families, comply with the federal Indian Child Welfare Act, and seek to protect the best interest of the child. Whenever an Indian child is removed from a foster care home or institution, guardianship, or adoptive placement for the purpose of further foster care, guardianship, or adoptive placement, placement of the child shall be in accordance with the Indian Child Welfare Act."

Senate Bill 678 also added provisions to the Welfare and Institutions Code that codified ICWA's procedural and substantive standards into California law. Those that are relevant to the issues before us will be addressed in detail below.

With that framework in mind, we turn to the claimed errors before us.

31

### III. SUMMARY OF ARGUMENTS[9]

Patricia and Bryan challenge the order terminating their parental rights to Autumn on five separate grounds. They are, in the order we will address them, as follows:

First, and most fundamentally, the parents contend the Department mishandled the request for exemption of José's criminal conviction on multiple levels. As a preliminary matter, they claim the Department did not present any competent evidence José had a nonexemptible conviction. In the absence of such evidence, they submit, the court abused its discretion in dismissing Teresa as a viable placement option. Alternatively, they contend the Department misconstrued the applicable law because, under two different statutes, José's alleged offense was in fact exemptible. Finally, they contend it erred by failing to conduct a meaningful evaluation of the exemption request, further claiming that if the Department had in fact done so, it would have been an abuse of discretion to deny it.

Second, the parents argue that the court lacked good cause to deviate from the ICWA placement preferences with which it was obligated to comply. Additionally, they argue the Department failed to make active efforts to comply with the placement preferences.

Third, they contend the juvenile court erred in failing to apply one of two exceptions to termination of parental rights. The first prohibits termination of parental rights where it would result in substantial interference with a child's sibling relationship. (§ 366.26, subd. (c)(1)(B)(v).) The second applies where, in the instance of an Indian child, termination would substantially interfere with the child's connection to his or her tribal community or the child's tribe had identified another permanent living arrangement, such as a guardianship, for the child. (*Id.*, subd. (c)(1)(B)(iv).)

Fourth, they contend the Department mishandled the Indian custodian designation forms signed by Patricia and Teresa. Their arguments pertaining to this issue are threefold. First, they claim that pursuant to the forms, Teresa was Autumn's rightful

---

[9] Patricia and Bryan both join in the other's opening brief. As such, we treat each argument is if it were raised by both parents.

custodian at the hospital, and the Department had no grounds for removing the infant from her care. Alternatively, they contend that if the Department had cause to remove her from Teresa's custody, then Teresa was entitled to reunification services. As it was, she never even received the notice of the dependency proceedings that she was entitled to as Autumn's Indian custodian, and she suffered prejudice as a result. Finally, they contend the juvenile court, once made aware of the forms, should have declined jurisdiction over the petition and returned Autumn to Teresa's care.

Fifth, they contend the court erred by applying the existing Indian family doctrine, a doctrine that has been abrogated in California.

Patricia and Bryan seek reversal of the order terminating their parental rights and remand with instructions that José's criminal conviction be exempted and that Autumn be placed with her grandparents under a legal guardianship. Alternatively, they request placement of Autumn with Beatrice if the Department determines, upon proper evaluation, that José's conviction is nonexemptible.

## IV. DISCUSSION

### A. The Department Misconstrued the Applicable Statutes When It Concluded José's Conviction Was Nonexemptible and Thus Abused Its Discretion In Denying the Exemption Request

**Introduction to the Issue**

One of the most critical issues below—if not *the* most critical—was the request for an exemption of José's alleged Penal Code section 272 conviction. With an exemption, Autumn could be placed in a home with her six siblings, where she would be connected to her Chickasaw heritage and taken care of by her doting grandmother—in other words, an ideal placement that complied with ICWA's placement preferences. Without an exemption, the Department could not place Autumn there. The Department never evaluated José's exemption request on the merits, however, instead concluding his offense was nonexemptible and thus precluded placement. This conclusion was wrong as a matter of law.

**Applicable Statutory Provisions**

Prior to placing a detained child in the home of a relative or other person who is not a licensed foster parent, the Department must conduct a criminal records check on all adults living at the residence.  (§ 361.4, subd. (b)(1).)  If the criminal records check indicates the person has no criminal record, the home may be considered for placement.  (§ 361.4, subd. (d)(1).)  If, however, the person has been convicted of a crime that would preclude licensure as a foster home, the child cannot be placed in the home, unless an exemption is granted.  (*Id.*, subd. (d)(2).)

Convictions generally fall into two categories:  exemptible and nonexemptible.  (Health & Saf. Code, § 1522, subd. (g)(1); Cal. Code Regs., tit. 22, § 80019.1; *In re Esperanza C.* (2008) 165 Cal.App.4th 1042, 1056.)  If an offense is exemptible, a designated county agency has the authority to grant an exemption where there is "substantial and convincing evidence to support a reasonable belief that the person with the criminal conviction is of such good character as to justify the placement and not present a risk of harm to the child . . . ."[10]  (§ 361.4, subd. (d)(2), (3)(A).)  If an offense is nonexemptible, the child cannot be placed in that home.  (*Id.*, subd. (d)(2); Health & Saf. Code, § 1522, subd. (g)(1)(A)(i); *In re Esperanza C., supra,* 165 Cal.App.4th at p. 1057.)

Health and Safety Code section 1522, subdivision (g)(1)(A)(i), identifies the offenses that are designated as nonexemptible, a list that includes offenses specified in Penal Code section 290, subdivision (c).[11]  Section 290 is the Sex Offender Registration

---

[10] Initially, the State Department of Social Services had the sole authority to grant exemptions.  (*In re Jullian B., supra,* 82 Cal.App.4th at p. 1350.)  In 2001, however, the Legislature amended section 361.4, subdivision (d) to allow a county agency to grant exemptions if the Director of Social Services has authorized it to do so.  (§ 361.4, subd. (d)(3)(A), as amended by Stats. 2001, ch. 445, § 1.)

[11] The enumerated offenses are as follows:  "An offense specified in Section 220, 243.4, or 264.1, subdivision (a) of Section 273a or, prior to January 1, 1994, paragraph (1) of Section 273a, Section 273d, 288, or 289, subdivision (c) of Section 290, or Section 368 of the Penal Code, or was a conviction of another crime against an individual specified in subdivision (c) of Section 667.5 of the Penal Code."  (Health & Saf. Code, § 1522, subd. (g)(1)(A)(i).)

34

Act and identifies offenses requiring lifetime registration in California as a sex offender. (Pen. Code, § 290, subd. (b), (c).)  Such offenses include "any offense involving lewd or lascivious conduct under Section 272." (*Id.,* subd. (c).)

It has been said that the process of determining whether an offense is nonexemptible "presents a high danger of error." (*Doe v. Saenz* (2006) 140 Cal.App.4th 960, 997.)  "This danger of error is enhanced due to the complexity of the statutory scheme identifying more than 50 non-exemptible offenses, some of which are non-exemptible only under specified conditions." (*Ibid*.)

### Circumstances Surrounding José's Conviction

On February 23, 2012, counsel for Teresa sent a letter to the Department appealing its February 15, 2012 denial of a request for an exemption for José's conviction.  That letter described the circumstances surrounding José's arrest as follows:

José, a 19-year-old high school senior, and Teresa, a 14-year-old eighth grader, met in Crescent City in 1976, when José was an exchange student visiting from Mexico. They met at a school dance and embarked upon a relationship.  A relationship between an older man and a younger girl was not uncommon in José's native country at the time, and their relationship had the full support of Teresa's parents.

When José and Teresa had been dating for just under a year and were engaged to be married, they were caught together—fully clothed—at a motel.  Both were arrested. According to Teresa's attorney, José was convicted "of the underlying offense" and was prohibited from contacting Teresa for one year.

José moved to San Jose, and Teresa continued on to high school.  After the year passed, José contacted Teresa through his cousin, providing a phone number and indicating he would like to hear from her if she was so inclined.  Teresa quickly contacted José and then traveled to San José to visit him, and within days they advised their parents they wanted to get married.  Teresa's father not only consented, but gave the couple money so they could travel to Reno to get married, which they did on July 22, 1978.  They later returned to Crescent City, where they still lived at the time of the dependency proceeding 33 years later.

While the record does not contain any evidence pertaining to José's conviction—no arrest record, no abstract of judgment, nothing—we can surmise from the parties' briefs and passing references in the reporter's transcript that he was convicted of contributing to the delinquency of a minor in violation of Penal Code section 272.[12]

**The Department Erred in Determining That José's Conviction Was Nonexemptible**

Penal Code section 272 makes it a misdemeanor to commit any act or fail to perform a duty that encourages a minor to commit an unlawful act or violate a court order, in other words, to contribute to the delinquency of a minor. Lewd and lascivious conduct is not an element of a section 272 offense. For a section 272 offense to be nonexemptible in the dependency context, however, it must have involved lewd and lascivious conduct. (Pen. Code, § 290, subd. (c); *In re Esperanza C., supra,* 165 Cal.App.4th at p. 1057 [section 272 conviction may be exemptible or nonexemptible, depending on the conduct for which the person was convicted].) Here, there was no evidence that José's offense involved lewd and lascivious conduct, nor does anything in the record suggest the Department found evidence of such conduct. Rather, all indications in the record suggest the offense was deemed nonexemptible simply because it was a violation of section 272.

The court in *In re Esperanza C., supra,* 165 Cal.App.4th at p. 1061, directly addressed this issue:

"The statutory scheme governing criminal records exemptions does not permit the agency to *infer* that an applicant's Penal Code section 272 conviction involved lewd and lascivious behavior. An applicant is not required to prove that his or her section 272 conviction is *not* a nonexemptible sex offense. (Health & Saf. Code, § 1522, subd. (g); see generally *Gresher v. Anderson* [(2005)] 127 Cal.App.4th [88], 105–110 [discussing

---

[12] It appears some quantum of evidence of José's criminal history was presented to the court. At the permanency hearing, the court asked to "look at the alleged expungement document," and subsequently referred to "the conviction set forth in those three files we looked at . . . ."

36

applicant's due process rights in the criminal exemption process].) Either the agency has a valid record that the applicant was convicted, by proof beyond a reasonable doubt, of a sex offense (or other nonexemptible offense), or it does not. Further, an applicant is not required to prove the nonexistence of an offense to show good moral character. (§ 361.4, subd. (d)(2); Cal. Code Regs., tit. 22, § 80019.1, subds. (e), (f); *see Gresher v. Anderson, supra,* at pp. 97, 113.) [¶] Unless the Agency has a record that [the applicant] was convicted of lewd and lascivious behavior under Penal Code section 272, its classification of the section 272 conviction as a nonexemptible offense is erroneous as a matter of law. A decision that rests on an error of law constitutes an abuse of discretion. [Citation.]."

This is the Department's response to this argument: "There was adequate evidence in the record, in addition to the judge personally viewing the conviction files, to determine that the conviction was a [Penal Code section] 272 conviction which involved 'lewd or lascivious' conduct." And it goes on to argue that José's conviction was for "having sex with a minor," which, it contends, "fits the definition of a 'lewd or lascivious act' under [Penal Code section] 272." In fact, José was not convicted of "having sex with a minor," which would have been a Penal Code section 261.5 violation; he was convicted of contributing to the delinquency of a minor, and that offense does not necessarily include lewd or lascivious conduct. And as to the Department's suggestion that there was sufficient evidence of lewd or lascivious conduct because the trial court personally reviewed the files, nothing suggests that the court even knew lewd or lascivious conduct was required to render the Penal Code section 272 conviction nonexemptible.

It follows, then, that unless the Department had a record that José was convicted of lewd or lascivious behavior under Penal Code section 272—and evidence of that certainly does not exist in the record—its classification of the section 272 conviction as nonexemptible was erroneous as a matter of law. As such, its decision regarding José's request for an exemption constituted an abuse of discretion. (*In re Esperanza C., supra,* 165 Cal.App.4th at p. 1061.)

37

But even if we were to accept the Department's claim that there was sufficient evidence of lewd and lascivious conduct, we would still conclude the Department erred in deeming José's offense nonexemptible. As noted above, certain convictions are considered nonexemptible and will prevent placement of a dependent child in that home. (§ 361.4, subd. (d)(2); Health & Saf. Code, § 1522, subd. (g)(1)(A)(i)).) According to Patricia and Bryan, however, the Welfare and Institutions Code contains a provision that, in the case of an Indian child, allows the Department to grant an exemption of an offense that is classified as nonexemptible. That section is subdivision (f) of section 361.4, which states that upon request from an Indian tribe, the Department of Social Services (or an authorized county agency) "shall evaluate an exemption request, if needed, to allow placement into an Indian home that the tribe has designated for placement under the federal Indian Child Welfare Act (25 U.S.C. Sec. 1901 et seq.) *that would otherwise be barred under this section*." (Italics added.) We agree with the parents' interpretation of the statute.

The rules governing statutory construction are well established. "Our goal is to determine the Legislature's intent and adopt a construction that best effectuates the purpose of the law. [Citations.] We begin with the statutory language because it generally provides the most reliable indication of legislative intent. [Citations.] ' "If the statutory language is unambiguous, we presume the Legislature meant what it said, and the plain meaning of the statute controls. [Citation.]" [Citation.] We consider extrinsic aids, such as legislative history, only if the statutory language is reasonably subject to multiple interpretations.' " (*In re W.B., supra,* 55 Cal.4th at p. 52; accord *MacIsaac v. Waste Management Collection & Recycling, Inc.* (2005) 134 Cal.App.4th 1076, 1082-1084.) We review issues of statutory construction de novo. (*Martinez v. Enterprise Rent-A-Car* (2004) 119 Cal.App.4th 46, 52.)

Consistent with the above guidelines, we first examine the language of section 361.4, subdivision (f)—"that would otherwise be barred"—to ascertain whether it evidences an intent to allow, in the instance of an Indian child, the exemption of a conviction for an offense that is generally classified as nonexemptible. We must give the

words their usual, ordinary, and commonsense meaning. (*California Teachers Assn. v. Governing Bd. of Hilmar Unified School Dist.* (2002) 95 Cal.App.4th 183, 191.) Doing so, we conclude that subdivision (f) was intended to expressly carve out an exception to the general prohibition against placement of a dependent child in a home with a person convicted of a nonexemptible offense in order to allow placement of an Indian child in an Indian home under the appropriate circumstances. In other words, when requested to do so by a tribe, it allows the Department to grant an exemption where it would otherwise be prohibited from doing so. We perceive no ambiguity in the language and, indeed, the Department suggests no other interpretation of the language. We thus presume the Legislature meant what it said. (*Miklosy v. Regents of University of California* (2008) 44 Cal.4th 876, 888.)

Further, a statute cannot be read in isolation, but rather must be read " ' "with reference to the entire scheme of law of which it is a part . . . ." ' " (*Calatayud v. State of California* (1998) 18 Cal.4th 1057, 1065.) Here, that requires construction of the provision in the context of ICWA, which, as extensively detailed above, was implemented to prevent the breakup of the Indian family. Allowing the tribe to request an exemption of an otherwise nonexemptible conviction is consistent with that objective. And as the BIA Guidelines instruct, we must liberally construe the statute "in favor of the result that is consistent with" ICWA's preferences. (BIA Guidelines, *supra*, p. 67586.)

The Department's opposition to this argument says this in its entirety:

"Appellant argues that § 361.4(f) would have allowed the Department of Social Services to evaluate an exemption which would otherwise be barred. However, this section must be interpreted in accordance with other statues [*sic*] and applicable law. To say that this statute allows a Department to waive a non-exemptible conviction in any case would mean there are actually no convictions that are non-exemptible. This does not make sense with the rest of the statutory scheme. Although the interests of Tribes in being able to advise on an appropriate home is great, it should not be considered to be greater than protecting a child from possible abuse which is the purpose of non-exemptible convictions. Public policy weighs against this interpretation of the law.

39

"Section 361.4(f) cannot override the non-exemptible convictions which are on the federal non-exemptible crimes list. Under §361.4(f) the Tribe is entitled, if it requests, to have the criminal record of a relative, potential caregiver evaluated. This does not automatically translate to the criminal record being waived. The language of the statute refers only to *evaluate* an exemption request not to grant an exemption." We are not persuaded.

We begin with the Department's assertion that "To say that this statute allows a Department to waive a non-exemptible conviction in any case would mean there are actually no convictions that are non-exemptible." By its own terms, subdivision (f) of section 361.4 is limited to the instance of an Indian child, in recognition that Indian children are differently situated under California dependency laws due to mandates of ICWA. Additionally, it does not provide for mandatory exemption upon request. Rather, it merely creates the possibility of exemption, and the Department must still find sufficient evidence of good character to justify the placement and not risk harm to the child. (§ 361.4, subd. (d)(2).)

Further, the Department's position ignores the plain language of the statute: "would otherwise be barred." In construing a statute, we must "accord significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose. A construction making some words surplusage is to be avoided." (*Kane v. Hurley* (1994) 30 Cal.App.4th 859, 862.) The Department's interpretation renders the phrase "would otherwise be barred" superfluous.

Finally, as to the Department's puzzling suggestion that the statute permits the *evaluation* of an exemption request but does not authorize the *granting* of such a request, we simply note the maxim of jurisprudence that "[t]he law neither does nor requires idle acts." (Civ. Code, § 3532.)

**The Department Failed to Complete a Meaningful Evaluation of the Exemption Request**

Because the Department erroneously determined José's conviction was nonexemptible, it failed to evaluate the exemption request on the merits. The parents ask

that we remand with instructions that José's criminal conviction be exempted to allow for placement of Autumn in her grandparents' home. This, we cannot do. (See, e.g., *In re M.L.* (2012) 205 Cal.App.4th 210, 226; *In re Esperanza C., supra,* 165 Cal.App.4th at pp. 1062–1063.) But on remand, the Department must conduct a meaningful evaluation, and it cannot unreasonably deny the request, for doing so would necessarily frustrate the goals ICWA is intended to achieve by potentially depriving Autumn of a placement that protects her Indian heritage. (*In re Jullian B., supra,* 82 Cal.App.4th at p. 1350.)

The Department suggests that even if it had conducted a proper evaluation, it could "easily [have] conclude[d] that the grandfather was not of such good character as to justify the placement" because he also had "DUI offenses and an offense dealing with being in the car with a person that had drugs." While this issue is not currently before us, given what we know from the record, we would be hard pressed to agree. Nevertheless, if the Department denies the exemption, "the record must establish that [it] exercised sound discretion in denying the waiver and must set forth the reasons therefor." (*In re Jullian B., supra,* 82 Cal.App.4th at p. 1350.)

In light of our ruling on this issue, we cannot address the parents' alternative arguments that the court's finding of good cause to deviate from the ICWA placement preferences was unsupported by substantial evidence and that the court erred in terminating parental rights rather than ordering a guardianship consistent with the Indian child exception to termination. This is so because in reaching its decision regarding a permanent plan for Autumn, the juvenile court was operating under the assumption that the grandparents' home was not available for placement, which assumption was the direct result of error. As such, the court did not have a complete picture.

We cannot speculate what the court would have done had the Department correctly interpreted the law and conducted the requisite investigation. As we noted *ante*, however, the grandparents' home appeared to be an ideal placement. Multiple educators and members of the community attested to the commitment with which Teresa was raising her six other grandchildren. She was thoroughly dedicated to these children and,

41

by all indications, was doing an exemplary job. Further, she zealously fought for placement of Autumn, attending most, if not all, of the hearings in the dependency proceeding and maintaining weekly visits with Autumn throughout. Finally, placement in the home would mean that Autumn would be in daily contact with her siblings and immersed in her Chickasaw heritage.

We close the discussion on this issue by quoting a paragraph of vigorous criticism made by *amicus curiae* Yurok Tribe: "Social Workers, Judges and Attorneys in Del Norte County still view the ICWA through the lens of white, middle-class values and value judgments. Children are routinely placed in non-tribal homes with little or no effort to locate viable Indian family members. After the children have resided with their non-tribal caretakers for a few months, Anglo values that support the concept of bonding and the judicially created doctrine of De Facto Parents are used against those Indian family members that do come forward. Tribes—which may be thousands of miles separated from local courts—and Indian families that are often poor and poorly educated, receive less than adequate representation in State courts. [¶] It is the position of the *Amicus* that *In re Autumn* is one such case. The Chickasaw Nation is located in Ada, [Oklahoma,] more than 2,000 miles from Crescent City, [California]. The maternal Grandmother appeared at every single court hearing and requested placement and visitation on numerous occasions but was never really heard. The non-Indian De Facto Parents did nothing wrong, but they were blessed with the advantage of a judicially-created Party status merely because the Juvenile Court refused to place Autumn with her Grandmother. Then, the Juvenile Court relied upon bonding with those caretakers, who had no previous relationship with these children, as the ultimate reason why parental rights should and must be terminated." While we cannot endorse all that is in that paragraph, we certainly can endorse the complimentary characterization of Teresa.

Along those same lines, it has been said that "[e]motional bonding between a child and his or her placement which occurs as a result of a local or state agency's failure to comply with the ICWA does *not* constitute good cause for deviating from the ICWA's placement preferences, although considerable trauma to the child may occur as a result."

(California Judges Benchguide:  The Indian Child Welfare Act, *supra,* at p. 48, citing *In re Desiree F., supra,* 83 Cal.App.4th at p. 476; *Mississippi Band of Choctaw Indians v. Holyfield, supra,* 409 U.S. at pp. 53–54.)

### B.    The Department's and the Court's Handling Of the Indian Custodian Designation Forms Does Not Mandate Reversal

While we cannot, as noted, address two of the arguments made by Patricia and Bryan, we can address their fourth and fifth claims.  As to the Indian custodian designation forms, they claim that when Autumn was born, Teresa immediately became her custodian by virtue of the tribal custodian forms Patricia and Teresa executed.  As such, they reason, Autumn was immediately transferred to Teresa's custody upon her birth, and the Department had no basis for detaining her from Teresa.  Alternatively, they submit that if Autumn was in fact properly detained from Teresa, the Department was obligated to provide her notice of the dependency proceedings and reunification services.  Finally, they contend the juvenile court, upon learning of the forms, was obligated to decline jurisdiction over the petition and return Autumn to Teresa's care.  These arguments fail for multiple reasons.

First, Autumn was never in Teresa's custody.  "Indian custodian" is defined as "any Indian person who has legal custody of an Indian child under tribal law or custom or under State law or to whom temporary physical care, custody, and control has been transferred by the parent of such child."  (25 U.S.C., § 1903(6).)  Here, there was no evidence Patricia ever turned custody of Autumn over to Teresa.  From the outset of the dependency proceeding up until the section 366.26 hearing, Patricia acted as if Autumn had been removed from her custody.  Even Teresa testified at the June 25, 2012 hearing on her de facto parent status request, "She was never in my custody."

Second, assuming arguendo that the forms should have operated to transfer Autumn to Teresa's custody immediately upon her birth, Patricia implicitly revoked that custody arrangement when Autumn was returned to her care a week after the child's birth.

43

Third, Bryan did not sign either of the forms.  We question the validity of a form that purports to give custody of a child to someone else when the form was not executed by both parents, especially where, as here, there was no dispute about paternity.  (See *In re G.L.* (2009) 177 Cal.App.4th 683, 695 [allowing one parent to defeat the other parent's revocation of an Indian custodian designation "would have the unintended effect of allowing one parent to usurp the rights of the other parent with respect to an Indian child's temporary custody"].)

Fourth, the forms designated Teresa as Autumn's Indian custodian from February 23, 2011 to February 2012.  The arrangement therefore terminated—assuming it was ever operative—in the mist of the dependency proceeding, and well before June 2012, when the forms were first brought to the court's attention.

Fifth, the parents argue that as the Indian custodian, Teresa should have received notice of the dependency proceedings, as mandated by ICWA.  A notice violation under ICWA is subject to harmless error analysis.  (*In re Brooke C.* (2005) 127 Cal.App.4th 377, 384–385.)  "An appellant seeking reversal for lack of proper ICWA notice must show a reasonable probability that he or she would have obtained a more favorable result in the absence of the error." (*In re G.L., supra,* 177 Cal.App.4th at p. 696.)  Teresa can make no such showing, since she was aware of the proceedings, as evidenced by the fact that she attended most, if not all, of the hearings in the proceeding.

Sixth, an Indian custodian has a right to intervene at any time.  (25 U.S.C. § 1911(c); § 224.4; Cal. Rules of Court, rule 5.482(e).)  If Teresa believed she was in fact Autumn's proper Indian custodian, she could have—and should have—moved to intervene.  She did not do so.

Seventh, aside from purportedly having shown the forms to the social worker at the hospital immediately following Autumn's birth, at no other time during the proceeding did Patricia, Teresa, or anyone else give the forms to the Department.  The court was not made aware of the forms until at or just before the section 366.26 hearing.  By failing to bring this issue to the court's attention, the parents forfeited it.

44

## C. There Is No Evidence The Court Applied the Existing Indian Family Doctrine

Lastly, the parents contend that the juvenile court improperly applied the existing Indian family doctrine, as purportedly evidenced by questions the court asked of Teresa during the section 366.26 hearing. For example, it asked her how many times she had "sat down with [her] six grandchildren and instructed them on specific aspects of culture and custom?" It asked her, "What is different about your lifestyle that makes you different from non Indian families?" It also wanted to know "if there's something different about how this family, a Chickasaw family, what lengths they've gone to, to preserve all those customs and traditions that [the expert] says are so important to preserving the Indian way of life." And it was curious about "how much actual involvement has taken place through persons such as grandma who would know about those matters and pass that on to grandchildren and be passed on to Autumn as a member of this family." In short, according to the parents, the court's questions essentially asked Teresa "how Indian she was." This was, they contend, "an attempt to use a 'back-door approach to do exactly what the ICWA was intended to prevent: imposition of white middle class standards to child custody cases involving American Indian children.' "

Prior to the 2006 passage of SB 678, there was a split in the California Courts of Appeal on the viability of an exception to application of ICWA known as the "existing Indian family doctrine." (See *Adoption of Hannah S.* (2006) 142 Cal.App.4th 988, 995 [identifying which districts adopted the doctrine and which rejected it.] This judicially-created doctrine looked for an existing and significant social or cultural connection to an Indian tribe or community as a prerequisite to the application of ICWA to a dependent child. (*Ibid.*)

With the passage of SB 678, however, the Legislature made clear that an Indian child's best interests are served by protecting the child's connection to his or her tribe and to the tribal community, "regardless of whether the child is in the physical custody of an Indian parent or Indian custodian at the commencement of a child custody proceeding, the parental rights of the child's parents have been terminated, or where the child has

resided or been domiciled." (§ 224, subd. (a)(2); see also Fam. Code, § 175, subd. (a)(2)(A); Prob. Code, § 1459, subd. (a)(2).) There is no question that the existing Indian family doctrine is not viable in California. (See *In re Vincent M.* (2007) 150 Cal.App.4th 1247, 1251.) And we do not understand the court's questions of Teresa concerning her involvement in the Indian culture to suggest that it was applying the doctrine.

## V. DISPOSITION

We close with the observation that we are extremely cognizant of concerns for the well being of a dependent child anytime he or she is moved from one placement to another. And we do not lightly enter an order that may delay the permanency this young dependent child so rightfully deserves. That said, the Department and the juvenile court are obligated to follow the law, and that was not done here. The order terminating parental rights is therefore reversed. The matter is remanded to the juvenile court with instructions that it order the Department to evaluate José's request for a criminal records exemption and to promptly report its decision to the court and parties. Should it grant the exemption, it shall then file a supplemental selection and implementation plan, after which the court shall hold a further permanency hearing in accordance with section 366.26. Should the Department deny the exemption, the record must establish that it exercised sound discretion in doing so. It must also make active efforts to locate an appropriate placement that is ICWA-compliant.

_____
Richman, J.

We concur:

_____
Kline, P.J.

_____
Haerle, J.

46

| | |
|---|---|
| Trial Court: | Del Norte County Superior Court |
| Trial Judge: | Honorable John R. Morrison |
| Attorney for Defendant and Appellant Mother: | Suzanne Davidson, under appointment by the Court of Appeal |
| Attorney for Defendant and Appellant Father: | Elysa J. Perry, under appointment by the Court of Appeal |
| Attorney for Yurok Tribe as Amicus Curiae in Support of Appellants: | Charles N. Henry |
| Attorneys for Plaintiff and Respondent: | Gretchen Stuhr, County Counsel, Elizabeth Cable, Deputy County Counsel |